[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 17, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-14324
_____

D. C. Docket No. 02-00019-CV-5-19-MMP

DANIEL BENITEZ,

Petitioner-Appellant,

versus

ROBERT WALLIS, Director INS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(July 17, 2003)**

Before DUBINA, BLACK and HULL, Circuit Judges.

PER CURIAM:

Daniel Benitez, a native and citizen of Cuba, is an inadmissible alien who brought this § 2241 petition challenging his indefinite detention. The district court concluded that the INS's determinations that Benitez posed a danger to the community and was likely to engage in further violent behavior were facially

legitimate and bona fide reasons to detain Benitez until removal to Cuba is possible. Consequently, the district court denied Benitez's § 2241 petition. After review and oral argument, we affirm.

## I. BACKGROUND

In 1980, Daniel Benitez attempted entry into the United States from the port of Mariel, Cuba and, in effect, was stopped at the border.[1] Benitez then was paroled into the United States pursuant to § 212(d)(5) of the Immigration and Nationality Act ("INA"). See 8 U.S.C. § 1182(d)(5). Under § 1182(d)(5), the Attorney General may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5).

In 1983, Benitez was convicted in Dade County, Florida, of second degree grand theft, see Fla. Stat. § 812.014, and was sentenced to three years' probation.

---

[1]Over the past twenty-five years,
> Castro has unleashed massive waves of refugees on the United States to release the pressure of internal dissent. In the Mariel boat-lift of 1980, Castro let some 125,000 Cubans flee to the United States. Many of these refugees were dissidents, criminals or mental patients. In the summer of 1994, facing increasing hostility to his regime and open defiance of the Communist Party, Castro allowed over 50,000 refugees to flee to the United States on make-shift rafts. After the exodus of 1994, Castro threatened to unleash another wave of refugees in the spring of 1995 in an effort to discourage passage of the Helms-Burton Act . . . .

C. Todd Piczak, The Helms-Burton Act: U.S. Foreign Policy Toward Cuba, The National Security Exception to the GATT and the Political Doctrine, 61 U. Pitt. L. Rev 287, 312-13 (Fall 1999).

Sometime thereafter, Benitez submitted an application to adjust his status to that of a lawful permanent resident. Under applicable immigration laws, Cuban refugees may apply for permanent resident status once they: (1) have been paroled into the United States; (2) have been physically present in the United States for one year; and (3) are eligible to receive an immigrant visa and are admissible to the United States for permanent residence. See 8 U.S.C. § 1255.[2]

Under the provisions of § 212(a) of the INA, certain classes of aliens are ineligible to receive an immigrant visa and are not admissible to the United States for permanent residence, and thus fail to meet the third condition outlined above. See 8 U.S.C. § 1182(a). One such class includes "[a]liens who have been convicted of a crime involving moral turpitude." 8 U.S.C. § 1182(a)(9) (1983). In 1985, Benitez's application for permanent resident status was denied because his criminal conviction for grand theft was a crime involving moral turpitude.[3]

---

[2]Section one of the Cuban Refugee Adjustment Act of 1966, Pub. L. No. 89-732, 80 Stat. 1161, as amended 8 U.S.C. § 1255, historical and statutory notes, provides:

> That, notwithstanding the provisions of Section 245(c) of the Immigration and Nationality Act, … the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959, and has been physically present in the United States for at least one year, may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence.

[3]A second application for adjustment of status filed by Benitez was denied in 1990 for lack of prosecution.

In 1993, Benitez pled guilty to a multi-count criminal indictment in Florida state court. Specifically, Benitez pled guilty to armed burglary of a structure, armed burglary of a conveyance, armed robbery, unlawful possession of a firearm while engaged in a criminal offense, carrying a concealed firearm, aggravated battery, and unlawful possession, sale or delivery of a firearm with an altered or removed serial number. The state court sentenced Benitez to 20 years' imprisonment.

Based on his 1993 criminal convictions in Florida, the INS determined that Benitez's continued immigration parole was against the public interest. Pursuant to 8 C.F.R. § 212.5(d)(2), the INS revoked Benitez's immigration parole.[4]

Benitez then was ordered to appear before an immigration judge "to determine whether he should be excluded and deported." The notice informed Benitez that he had a right to counsel and to have a friend or relative present at the hearing. In 1994, Benitez was found excludable and deportable to Cuba because of his criminal convictions in Florida.[5]

---

[4]According to § 212.5(d)(2), "when in the opinion of the district director in charge of the area in which the alien is located neither emergency nor public interest warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status which he or she had at the time of parole." 8 C.F.R. § 212.5(d)(2) (1993).

[5]In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). See Pub. L. No. 104-208, 110 Stat. 3009, 3009-546 (1996). IIRIRA made comprehensive changes to the Immigration and Nationality Act (INA), including changes in immigration terminology. See generally Assa'ad v. United States Atty. Gen., 332 F.3d 1321, 1326-27 (11th Cir. 2003). Previously, individuals who were ineligible for admission to the

On October 11, 2001, Benitez was released into INS custody. Benitez's status then was reviewed pursuant to the Cuban Review Plan to determine whether it was in the public interest to release him from INS custody.[6] On November 6, 2001, Benitez appeared before the Cuban Review Panel.[7]

_____

United States were referred to as "excludable," while those who had gained admission were referred to as "deportable." See 8 U.S.C. §§ 1182, 1251 (1994). Excludable aliens are now referred to as "inadmissible" aliens. See 8 U.S.C. § 1182. Additionally, the amended INA now uses the term "removal proceedings" to refer to the proceedings applicable to both inadmissible and deportable aliens. See 8 U.S.C. § 1229a. For the purposes of this opinion, we use the terms excludable, inadmissable, and unadmitted interchangeably. We do so not to suggest that these terms under immigration laws will always have the exact same legal meaning, but rather because these terms as applied to Benitez are without any substantive difference. Benitez is excludable under the prior version of the INA, inadmissable under IIRIRA, and his immigration parole never constituted a formal admission or entry into the United States.

[6]Before the Cuban Review Panel makes a recommendation that a detainee be granted parole, a majority of the Panel must conclude that: "(i) The detainee is presently a nonviolent person; (ii) The detainee is likely to remain nonviolent; (iii) The detainee is not likely to pose a threat to the community following his release; and (iv) The detainee is not likely to violate the conditions of his parole." 8 C.F.R. § 212.12(d)(2).
     The panel also must consider the following factors when determining whether to recommend further detention or release on parole of a detainee: "(i) The nature and number of disciplinary infractions or incident reports received while in custody; (ii) The detainee's past history of criminal behavior; (iii) Any psychiatric and psychological reports pertaining to the detainee's mental health; (iv) Institutional progress relating to participation in work, educational and vocational programs; (v) His ties to the United States, such as the number of close relatives residing lawfully here; (vi) The likelihood that he may abscond, such as from any sponsorship program; and (vii) Any other information which is probative of whether the detainee is likely to adjust to life in a community, is likely to engage in future acts of violence, is likely to engage in future criminal activity, or is likely to violate the conditions of his parole." 8 C.F.R. § 212.12(d)(3).

     [7]According to § 212.12(d)(1),
     The Director shall designate a panel or panels to make parole recommendations to the Associate Commissioner for Enforcement. A Cuban Review Panel shall, except as otherwise provided, consist of two persons. Members of a Review Panel shall be selected from the professional staff of the Service. All recommendations by a two-member Panel shall be unanimous. If the vote of a two-member Panel is split, it shall adjourn its deliberations concerning that particular detainee until a third Panel member is added. A recommendation by a

On January 11, 2002, Benitez filed this § 2241 petition challenging his indefinite detention by the INS. On January 17, 2002, Benitez received a Notice of Releaseability, in which a Cuban Review Panel concluded that Benitez was releaseable under the criteria established by the Cuban Review Plan at such time as the INS determined that a suitable sponsorship to a half-way house could be arranged.[8] See 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.12 (2002) (Parole determinations and revocations respecting Mariel Cubans). On March 10, 2003, Benitez's Notice of Releaseability was revoked because the INS concluded, without a hearing, that Benitez was involved in a planned jail escape. See 8 C.F.R. § 212.12(e).[9] Therefore, Benitez's current detention results not only from his inadmissible alien status, but also from his violations of the conditions of his earlier immigration parole and the INS's determination that he has not refrained from criminal conduct while in custody.[10]

---

three-member Panel shall be by majority vote. The third member of any Panel shall be the Director of the Cuban Review Plan or his designee.
8 C.F.R. § 212.12(d)(1).

[8]Although the Notice was served/delivered on January 17, 2002, it is dated December 13, 2001.

[9]Benitez disputes his involvement in the planned jail escape. This issue, however, is not before this Court.

[10]Mariel Cubans who are being detained have their cases reviewed every year to determine whether they should be paroled. See 8 C.F.R. § 212.12(g)(2). There is no claim on appeal before this Court that Benitez has not received annual consideration for immigration parole in accordance with the Cuban Review Plan. Inadmissable aliens other than Mariel Cubans are considered for parole under similar procedures. See 8 C.F.R. § 241.4.

Benitez, proceeding pro se before the district court, asserted that his indefinite detention was unconstitutional in light of the Supreme Court's decision in Zadvydas v. Davis, 533 U.S. 678 (2001). According to the district court, the fact that Benitez was a "non-admitted parolee" made Zadvydas inapplicable because Zadvydas limited its holding to resident aliens. The district court concluded that the INS reasonably determined that Benitez was a danger to the community and was likely to engage in future criminal conduct. The district court further concluded that these determinations warranted Benitez's detention until he could be removed to Cuba. Finding no constitutional or statutory prohibition against Benitez's indefinite detention, the district court denied Benitez's § 2241 petition. Benitez timely appealed, and this Court, in its discretion, appointed counsel to represent Benitez on appeal.

## II. DISCUSSION

Benitez does not challenge the fact that he (1) attempted to enter illegally the United States, (2) never formally has been admitted into this country, and (3) is properly subject to removal. Instead, Benitez filed his § 2241 petition arguing only that his indefinite detention is impermissible given the Supreme Court's

decision in Zadvydas.[11]  On appeal, Benitez asserts that his indefinite detention violates both the United States Constitution and federal law.[12]

The INS continues to detain Benitez pursuant to 8 U.S.C. § 1231(a)(6). Thus, we first discuss § 1231(a)(6) and how the Supreme Court interpreted § 1231(a)(6) in Zadvydas.  We then analyze the legal issues presented in Benitez's appeal.

A.     8 U.S.C. § 1231(a)(6)

After an alien, such as Benitez, is ordered removed from the United States, the Attorney General must attempt to secure the alien's removal within 90 days. See 8 U.S.C. § 1231(a)(1) (the "removal period").[13]  "Under no circumstance

_____

[11] The Supreme Court has determined that habeas jurisdiction under § 2241 for cases involving aliens was not repealed by ADEPA or IIRIRA.  See INS v. St. Cyr, 533 U.S. 289, 314 (2001); see also Zadvydas, 533 U.S. at 688 (concluding that "§ 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention").

[12] The government does not contend that repatriation by Cuba of Benitez is reasonably foreseeable.  Thus, we accept Benitez's claim that he, at present, is subject to indefinite detention.

[13] In its response brief on appeal, the government asserts that pre-IIRIRA rules govern Benitez's indefinite detention.  However, in the district court proceedings, the government relied on IIRIRA, did not assert that pre-IIRIRA rules applied, and did not dispute (in any way) the district court's application of IIRIRA.  Therefore, the issue of whether IIRIRA applies to Benitez's claims has been waived by the government in this particular case.  See Onishea v. Hopper, 171 F.3d 1289, 1305 (11th Cir. 1999) (en banc); Depree v. Thomas, 946 F.2d 784, 793 (11th Cir. 1991).  Consequently, we apply IIRIRA to this case, but note that IIRIRA's application in Benitez's case is not free from doubt because the deportation proceedings against Benitez commenced in 1993 and Benitez's final deportation order was entered in 1994, both events well prior to IIRIRA.  See Rosales-Garcia v. Holland, 322 F.3d 386, 401-03 (6th Cir. 2003) (en banc) (discussing which statute to apply), cert. denied, 71 U.S.L.W. 3652, 3787, 3789 (U.S. June 23, 2003) (No. 02-1464); cf Akinwale v. Ashcroft, 287 F.3d 1050, 1052 n.2 (11th Cir. 2002) (applying IIRIRA to an indefinite detention claim where deportation proceedings commenced in

8

during the removal period shall the Attorney General release an alien who has been found inadmissible . . . ." 8 U.S.C. § 1231(a)(2). Congress, however, recognized that securing an alien's actual removal within 90 days is not always possible. Consequently, § 1231(a)(6) expressly authorizes the Attorney General to detain aliens beyond the 90-day removal period, as follows:

> An alien ordered removed who is inadmissible under section 1182 of this title, removable [for violations of nonimmigrant status or entry conditions, violations of criminal laws, or threatening national security] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

8 U.S.C. § 1231(a)(6).

B.     Zadvydas

In Zadvydas, the Supreme Court expressly addressed whether the government's authority under § 1231(a)(6) to detain two legal permanent residents beyond the 90-day removal period allowed the government to detain them indefinitely. The two legal permanent residents were ordered removed based on

1995, prior to IIRIRA, but the final order of deportation was entered on October 3, 1997, after IIRIRA); see also Alanis-Bustamante v. Reno, 201 F.3d 1303, 1306-07 (11th Cir. 2000) (discussing how Congress divided deportation proceedings into three categories). Thus, we expressly do not address whether Benitez's indefinite detention claims in his § 2241 petition should be tied to his 1994 deportation order and governed by pre-IIRIRA law or whether IIRIRA applies because Benitez is not challenging his 1994 deportation order but only the length of his detention pursuant to that order.

9

criminal convictions. The government, however, could not effectuate their removal because no country would accept them.

Specifically, Kestutis Zadvydas was a legal permanent resident alien of Lithuanian decent, who was born in a displaced persons camp in Germany in 1948. Zadvydas, 533 U.S. at 684. Zadvydas had a long criminal history and also a long history of flight, both in his criminal proceedings and his deportation proceedings. Id. In 1992, Zadvydas was convicted of possession with intent to distribute cocaine and was sentenced to 16 years' imprisonment in state prison. Id. After only two years' imprisonment, he was released into INS custody and ordered deported to Germany. Id.

Germany, however, refused to accept Zadvydas because he was not a German citizen. Id. Next, the INS attempted to deport Zadvydas to Lithuania. Id. Lithuania refused to accept Zadvydas because he was not a citizen or a permanent resident of Lithuania. Id. The INS also tried unsuccessfully to deport Zadvydas to the Dominican Republic (Zadvydas's wife's country). Id.[14]

---

[14]The district court ordered Zadvydas released under supervision because it believed that "the Government would never succeed in its efforts to remove Zadvydas from the United States, leading to his permanent confinement, contrary to the Constitution." Zadvydas, 533 U.S. at 685. The Fifth Circuit reversed, concluding "that Zadvydas' detention did not violate the Constitution because eventual deportation was not 'impossible,' good-faith efforts to remove him from the United States continued, and his detention was subject to periodic administrative review." Id.; see also Zadvydas v. Underdown, 185 F.3d 279 (5th Cir. 1999).

In Zadvydas, the Supreme Court also considered the case of Kim Ho Ma. Id. at 685. Ma was born in Cambodia, but fled to the United States at an early age. Id. In 1995, Ma was convicted of manslaughter and was sentenced to 38 months' imprisonment. Id. After two years' imprisonment, he was released into INS custody and ordered removed. Id. The United States, however, has no repatriation treaty with Cambodia. Id. at 686. Having no place to send Ma, the INS kept him in custody because "it was unable to conclude that Mr. Ma would remain nonviolent and not violate the conditions of release." Id. at 685-86 (internal quotation marks omitted).[15]

In evaluating indefinite detention in Zadvydas, the Supreme Court considered whether indefinite detention of resident aliens, if authorized by § 1231(a)(6) as the government contended, would present constitutional problems. The Supreme Court acknowledged that the two resident alien petitioners in Zadvydas enjoyed certain constitutional privileges associated with individuals who have gained entry into the United States. Id. at 693.

---

[15]In the district court, more than one hundred habeas corpus petitioners, like Ma, challenged their ongoing detention by the INS. The district court designated five lead cases that presented issues common to all petitioners and directed the parties to brief and argue those issues before five district court judges. The five district court judges issued a joint order establishing a legal framework to apply in each individual case. The five-judge panel determined that the Constitution forbids post-removal detention unless there is a realistic chance that the alien will be deported. The panel further concluded that because there was no repatriation agreement with Cambodia, there was no realistic chance that Ma and the others would be deported. A single judge then applied this ruling to Ma and held that he should be released. The Ninth Circuit affirmed Ma's release for essentially the same reasons as outlined by the panel of five judges. See Kim Ho Ma v. Reno, 208 F.3d 815 (9th Cir. 2000).

In Zadvydas, the Supreme Court also explained that Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206 (1953), permits the indefinite detention of unadmitted aliens whom the government is unable to return anywhere else, but noted that Mezei "differs from the present cases [in Zadvydas] in a critical respect." Zadvydas, 533 U.S. at 693. The critical difference is that the alien in Mezei was "treated, for constitutional purposes, as if stopped at the border." Zadvydas, 533 U.S. at 693 (internal citations omitted). According to the Supreme Court in Zadvydas, "that made all the difference" in its earlier decision that Mezei's indefinite detention did not violate the Constitution. Id.

In Zadvydas, the Supreme Court further stressed that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." 533 U.S. at 693. The Supreme Court also emphasized that "[i]t is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." Id. (citations omitted). "But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Id. (citations omitted).

After an extended discussion of the serious constitutional problems of permitting the indefinite detention of legal permanent residents as opposed to unadmitted aliens, the Supreme Court in Zadvydas saved § 1231(a)(6) from unconstitutionality in the context of a resident alien by limiting the post-removal-period detention to a length of time reasonably necessary to bring about the actual removal of the resident alien. Id. at 694-99. The Supreme Court then recognized six months as a presumptively reasonable time of post-removal-period detention for resident aliens. Id. at 699-702.

C.    Circuit Split Post-Zadvydas

A circuit split has developed as to whether Zadvydas limits only the government's authority to detain resident aliens or whether Zadvydas applies to all categories of aliens. Compare Borrero v. Aljets, 325 F.3d 1003, 1007 (8th Cir. 2003) (concluding "that Zadvydas's six-month presumption of reasonableness is inapplicable to inadmissible aliens"); Rios v. I.N.S., 324 F.3d 296, 297 (5th Cir. 2003) (concluding that Zadvydas "distinguished the status of deportable aliens from that of excludable aliens"); Hoyte-Mesa v. Ashcroft, 272 F.3d 989, 991 (7th Cir. 2001) (concluding that an inadmissible alien's "continued detention does not violate due process"), cert. denied, 123 S. Ct. 185 (2002); with Rosales-Garcia v. Holland, 322 F.3d 386, 408 (6th Cir. 2003) (en banc) (applying the reasonableness limitation that the Supreme Court read into § 1231(a)(6) in Zadvydas to

13

inadmissible aliens), cert. denied, 71 U.S.L.W. 3652, 3787, 3789 (U.S. June 23, 2003) (No. 02-1464); Xi v. I.N.S., 298 F.3d 832, 837-39 (9th Cir. 2002) (same).[16] Although a circuit split exists, the Supreme Court has denied certiorari in cases representing both viewpoints.

This case, however, requires us to join the debate and determine whether unadmitted aliens, post-Zadvydas, may be detained indefinitely under § 1231(a)(6). To do so, we first discuss why Benitez remains an inadmissable alien and then whether inadmissible aliens have a constitutional right to be free from indefinite detention. We then examine whether the reasonableness component, as read into § 1231(a)(6) by the Supreme Court in Zadvydas, applies to inadmissible aliens.

D.    Benitez Is an Inadmissible Alien

Because the status of the alien affects the issues herein, we begin by confirming Benitez's alien status. Although Benitez has been present physically

---

[16]The Sixth Circuit decision in Rosales was the result of an interesting procedural history. The district court denied the petitioner's § 2241 petition. The Sixth Circuit reversed the district court on January 31, 2001, and concluded that the indefinite detention of inadmissible aliens violates the Fifth Amendment. Following Zadvydas, the government petitioned the Supreme Court for certiorari, requesting that the Sixth Circuit's decision be vacated and remanded in light of Zadvydas. The Supreme Court granted the government's motion and vacated and remanded the case for reconsideration in light of Zadvydas. The Sixth Circuit then heard the case on remand en banc and concluded that the Supreme Court's interpretation of § 1231(a)(6) applied to all classes of aliens. The Supreme Court then denied certiorari.

in the United States for more than 20 years, we readily conclude that Benitez never formally has been admitted and remains an inadmissable alien.

As mentioned above, Benitez arrived in the United States as part of the Mariel boat-lift, was stopped at the border, and paroled into this country. He was paroled because Congress has recognized that it is often necessary to permit arriving aliens, such as Benitez, to make a temporary, unofficial entry into the United States pending the resolution of their applications. See Mezei, 345 U.S. at 215; see also 8 U.S.C. § 1225(b) (alien who does not appear to examining immigration officer to be entitled to land may be detained for further inquiry); 8 U.S.C. § 1182(d)(5)(A) (granting authority to the Attorney General to parole aliens seeking admission into the United States, but providing that parole does not constitute an admission of the alien). Furthermore, the Supreme Court has rejected claims that the parole or detention of an unadmitted alien has any effect on the alien's status under the law. See Leng May Ma v. Barber, 357 U.S. 185, 188 (1958).[17] Because an alien's legal status is not altered by detention or parole, it is clear that Benitez is, and remains, an inadmissable alien and is similar to any

---

[17]In Leng May Ma, the Supreme Court noted that "[f]or over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States." 357 U.S. at 188. Likewise, the Supreme Court explained that "[t]he parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status . . . ." Id. at 190; see also Mezei, 345 U.S. at 215 (alien permitted to enter pending a decision on admissibility "is treated as if stopped at the border"). This principle has become known as the "entry doctrine" fiction.

other alien who has not gained entry and is stopped at this country's border.  See

Jean v. Nelson, 727 F.2d 957, 969-70 (11th Cir. 1984) (en banc).

Any discussion of Benitez's rights in the immigration context must also start with the fundamental difference in the legal status of (1) unadmitted aliens and (2) resident aliens who have effected "entry" into the United States, whether illegally or legally.  This critical difference not only was recognized in Zadvydas, but has been a hallmark of immigration law for more than a hundred years.  For example, in Leng May Ma, the Supreme Court emphasized that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality."  357 U.S. at 187.  The Supreme Court continued that "[i]n the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'"  Id. (quoting Mezei, 345 U.S. at 212).

The Supreme Court further has explained that aliens seeking admission, such as Benitez, have no constitutional rights regarding their applications for admission.  See Landon v. Plasencia, 459 U.S. 21, 32 (1982) ("[A]n alien seeking admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative . . . .  [H]owever, once an alien gains admission to our country and

16

begins to develop the ties that go with permanent residence his constitutional status changes accordingly."); Kwong Hai Chew v. Colding, 344 U.S. 590, 600 (1953) ("'excludable' aliens . . . are not within the protection of the Fifth Amendment"); Bridges v. Wixon, 326 U.S. 135, 161 (1945) (Murphy, J., concurring) ("The Bill of Rights is a futile authority for an alien seeking admission for the first time to these shores.").

E.      Constitutional Analysis

Against this background, we now examine whether, post-Zadvydas, the indefinite detention of an inadmissable alien, like Benitez, violates the Constitution. As mentioned above, the Supreme Court in Mezei expressly addressed the government's authority to detain indefinitely unadmitted aliens. Mezei had lived in the United States for approximately 25 years. 345 U.S. at 208. He left the United States in 1948, without authorization or reentry papers, and resided in Hungary for 19 months. Id. He then attempted to return to the United States. Id. The United States refused to admit Mezei into the country, and he was detained indefinitely on Ellis Island.

Because Mezei had voluntarily left the country, the Supreme Court had "no difficulty in holding respondent an entrant alien or 'assimilated to [that] status' for constitutional purposes." Mezei, 345 U.S. at 214 (quoting Kwong Hai Chew v. Colding, 344 U.S. 590, 599 (1953)). The Supreme Court also stated that:

> It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. But an alien on the threshold of initial entry stands on a different footing: Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.

Mezei, 345 U.S. at 212 (internal citations and quotation marks omitted). The Supreme Court concluded that the unadmitted alien's continued, even indefinite, detention did not deprive him of any statutory or constitutional rights. Id. at 215.

This Court, sitting en banc, also has addressed the constitutional rights of inadmissible aliens in the context of indefinite detention. In Jean v. Nelson, 727 F.2d 957 (11th Cir. 1984) (en banc), this Court considered a group of Haitian aliens who were inadmissible and were being detained at various INS facilities pending a final determination of the merits of their individual asylum claims. After noting "the fundamental distinction between the legal status of excludable or unadmitted aliens and aliens who have succeeded in effecting an 'entry' into the United States," this Court concluded that "[a]liens seeking admission to the United States . . . have no constitutional rights with regard to their applications and must be content to accept whatever statutory rights and privileges they are granted by Congress." Jean, 727 F.2d at 967-68.

This Court then addressed the concerns of the critics of a policy or legal system that allowed for the indefinite detention of aliens. In Jean, this Court noted that

18

> [s]ome courts and commentators have suggested that when an exercise of the government's power to exclude results in an indefinite detention of an excludable alien, at some point the continued imprisonment becomes punishment, regardless of the legal justifications or fictions involved. These authorities contend that at this juncture the government should be required to make some justification to continue to detain the alien.

Id. at 974. The Jean Court concluded "that we must resist the temptation to tamper with the authority of the Executive by ruling that excludable aliens have constitutional rights [against indefinite detention], even with regard to their applications for parole." Id. at 975.

The Jean decision is based on Mezei. Although Mezei has been criticized heavily by academic commentators, it remains good law. As mentioned above, Mezei is distinguished and preserved, but is not overruled, in Zadvydas. See Zadvydas, 533 U.S. at 693-94. As Mezei remains valid precedent, so does Jean. Consequently, we conclude that inadmissible aliens, like Benitez, have no constitutional rights precluding indefinite detention. See, e.g., Borrero, 325 F.3d at 1007-08; Rios, 324 F.3d at 297; Hoyte-Mesa, 272 F.3d at 991.

F.    Statutory Right under § 1231(a)(6)

Although Benitez does not have a constitutional right precluding indefinite detention, we also must consider whether he has a statutory right under § 1231(a)(6), post-Zadvydas, prohibiting indefinite detention. As previously mentioned, a circuit split has developed as to the breadth of Zadvydas's holding.

19

The Fifth, Seventh, and Eighth Circuits have concluded that <u>Zadvydas</u> does not affect the government's long-standing authority to detain indefinitely unadmitted aliens. Although three circuits have so concluded, the Fifth Circuit in <u>Rios</u> and the Seventh Circuit in <u>Hoyte-Mesa</u> do not engage in any statutory analysis of how § 1231(a)(6) must be read after <u>Zadvydas</u>. Rather, they simply conclude that <u>Zadvydas</u> did not overrule <u>Mezei</u> and, therefore indefinite detention of unadmitted aliens is permissible. This conclusion, however, begs the separate question of statutory construction and whether the Supreme Court's interpretation of § 1231(a)(6) in <u>Zadvydas</u> must now apply uniformly to all types of aliens.

The Eighth Circuit in <u>Borrero</u> specifically does address the statutory issue of whether the <u>Zadvydas</u> Court's statutory construction of § 1231(a)(6) as containing a "reasonableness" component must apply categorically to all aliens, regardless of the alien's legal status. <u>Borrero</u>, 325 F.3d at 1005-07. The Eighth Circuit concluded that <u>Zadvydas</u>'s narrowing construction of § 1231(a)(6) does not limit the government's statutory authority to detain unadmitted aliens "[b]ecause the detention of unadmitted aliens does not raise the same constitutional concerns as does the detention of admitted aliens." <u>Id.</u> at 1005. The Eighth Circuit stressed that "[t]he constitutional issue avoided in <u>Zadvydas</u> is simply not present in the context of aliens who have not effected an entry into the United States." <u>Id.</u> at 1007.

In doing so, the Eighth Circuit expressly rejected alien Borrero's argument that the same statutory construction of § 1231(a)(6) must apply "categorically to all future cases whether or not the circumstances raise the same constitutional questions." Borrero, 325 F.3d at 1007. The Eighth Circuit acknowledged that the Ninth and the Sixth Circuits have taken the view that the same construction must apply, but the Eighth Circuit disagreed for several reasons. Id.

First, the Eighth Circuit "interpret[ed] Zadvydas as limiting the detention of only those aliens whose detention raises serious constitutional doubt – admitted aliens." Borrero, 325 F.3d at 1007. Second, the Eighth Circuit emphasized that "Zadvydas itself does not mandate uniform application of § 1231(a)(6) to all aliens." Id. The Eighth Circuit reached this conclusion based, in part, on the Supreme Court's notation that "'terrorism or other special circumstances' may justify greater deference to Congress and the Executive." Id. (quoting Zadvydas, 533 U.S. at 697). Third, the Eighth Circuit stressed how Zadvydas "expressly distinguished Mezei on the grounds that Mezei had not made an entry into the United States." Borrero, 325 F.3d at 1007. Based on these reasons, the Eighth Circuit concluded that "Zadvydas's six-month presumption of reasonableness is inapplicable to inadmissable aliens." Id.

We find the Eighth Circuit's reasoning persuasive and interpret Zadvydas as limiting the detention period of only those aliens whose continued confinement

21

raises serious constitutional doubt, i.e., resident aliens who have effected entry.

See id.; Xi, 298 F.3d at 841-42 (9th Cir. 2002) (Rymer, J., dissenting). But see

Rosales-Garcia, 322 F.3d at 408; Xi, 298 F.3d at 837-39. In addition to the

rationale given by the Eighth Circuit in Borrero, we adopt this view for several

other reasons.

First, Zadvydas reads like an as-applied constitutional challenge where the

Supreme Court repeatedly stated that its holding would not necessarily apply to

other situations. As previously stated, Zadvydas opens with the statement that

"[a]liens who have not gained initial admission to this country would present a

very different question." Zadvydas, 533 U.S. at 682. Because Zadvydas was

qualified in so many respects and reads like an as-applied decision, we conclude

that the Supreme Court left the law, and it seems to us the statutory scheme too,

intact with respect to inadmissible aliens who never have been admitted into the

United States.

Second, as does the dissent in the Ninth Circuit's Xi decision, we "take the

Supreme Court at its word: while indefinite detention raises serious constitutional

questions in the case of aliens who have been admitted to the United States,

'[a]liens who have not yet gained initial admission to this country would present a

very different question.'" Xi, 298 F.3d at 840 (Rymer, J., dissenting) (quoting

Zadvydas, 533 U.S. at 682). As does the Xi dissent, we reject the argument that

<u>Zadvydas</u> leaves us little choice but to apply § 1231(a)(6) uniformly to all aliens. See <u>Xi</u>, 298 F.3d at 841 (Rymer, J., dissenting). As aptly stated by Judge Rymer, "[w]e do have a choice because the Court's interpretation was discrete as to *admitted* aliens" and "[i]t was driven by the need to avoid constitutional problems that pertain to those who are admitted – but that do not pertain to those who are *not* admitted." <u>Id.</u> We further agree with Judge Rymer that "[t]he result is a nuanced interpretation of § 1231(a)(6) that keeps it from being applied unconstitutionally but otherwise leaves it alone. When a statute has different applications, it is not necessary to say that it is categorically infirm; it is only the constitutionally problematic aspects which are subject to the construction that avoids the problem." <u>Id.</u>

Third, <u>Zadvydas</u> emphasizes: "Nor do the cases before us require us to consider the political branches' authority to control entry into the United States. Hence we leave no 'unprotected spot in the Nation's armor.'" <u>Zadvydas</u>, 533 U.S. at 695-96 (citation omitted). The ability to exclude aliens from this country at its borders is a duty entrusted to the Executive Branch so that it may protect the citizens and residents of this country from all manner of nameless dangers. Creating a right to parole for unadmitted aliens after six months would create an unprotected spot in this country's defense of its borders. For example, it may be the case that the government will not be able to determine what potential dangers a

particular unadmitted alien might pose. In such a situation, the government historically has enjoyed broad latitude in detaining those aliens until their security threat can be fully ascertained. Removing this important tool from the government's arsenal undoubtedly would subject the residents of this nation to greater security risks.

Moreover, in the instant case, the government already has determined that Benitez poses a danger to the community and is likely to engage in further violent behavior, and therefore is a security threat. Benitez engaged in serious criminal conduct while paroled into this country. Even after his parole was revoked based on his criminal convictions, the INS again issued a Notice of Releaseability, but later revoked that Notice based on its determination that Benitez still refused to conform his conduct to the laws of this nation. In light of Benitez's criminal history, requiring Benitez's release after six months' detention does, in fact, create the very "unprotected spot in the Nation's armor" that the Supreme Court sought to avoid in Zadvydas. See Xi, 298 F.3d at 842 (Rymer, J., dissenting). We decline to read § 1231(a)(6) so as to deprive the Executive Branch of this authority absent an express statement from the Supreme Court to the contrary.

Fourth, ideally Benitez should be returned as soon as possible to his own country. However, this cannot happen if his own country will not allow it. Congress has given the Attorney General the discretion to detain or parole persons

who are not admitted into this country and whose own country will not take them back.  In light of the fact that the Supreme Court in <u>Zadvydas</u> went to such great lengths to distinguish inadmissible aliens, we shall not fetter that discretion by presumptively requiring their release into this country after six months.  As stated by Judge Rymer, "Congress did not prescribe it, nor does a serious constitutional doubt compel it, and we have no call to construe § 1231(a)(6) to contain this limitation for inadmissible aliens."  <u>Xi</u>, 298 F. 3d at 843 (Rymer, J., dissenting).

Fifth and finally, reading § 1231(a)(6) as creating a right to parole into this country after six months for inadmissible aliens is undoubtedly a drastic expansion of the rights of inadmissible aliens, who have never gained entry into this country. It is without question that Congress had a contrary intention when enacting IIRIRA: it sought to tighten immigration regulations.  As the very language of IIRIRA mandates, courts are not to construe IIRIRA to "create any substantive or procedural right or benefit that is legally enforceable."  8 U.S.C. § 1231(h).  It is also clear that Congress intended the use of the term "inadmissibility" to subject removable aliens to the same potential for indefinite detention – if they could not be removed after the commission of a serious crime – to which excludable aliens had been subject both statutorily and constitutionally for years.  <u>See, e.g.</u>, S. Rep. 104-249, 1996 WL 180026 at *7 ("The opportunity that U.S. immigration law

extends to aliens to enter and remain in this country is a privilege, not an entitlement.").

Inadmissible aliens such as Benitez never truly have resided in this country free from restraint. Rather, Congress has bestowed on them the luxury of parole while their immigration applications and status are finalized. To pervert this gift from Congress into a right after six months not only would distort Congress's intent and potentially create grave security concerns for the people of the United States, but also would create needless difficulties in how the INS processes aliens. Because <u>Zadvydas</u>'s holding is qualified in so many regards, and there is no need to construe § 1231(a)(6) to avoid constitutional due process concerns for inadmissible aliens, the government has the authority under § 1231(a)(6) to detain inadmissable aliens indefinitely and <u>Zadvydas</u>'s six-month presumption of reasonableness is inapplicable to inadmissible aliens.

## III. CONCLUSION

For all the above reasons, we affirm the district court's denial of Benitez's § 2241 petition.

AFFIRMED.