Marie Jose ULYSSE, Alien No. A 75 355 963, Petitioner,

v.

DEPARTMENT OF HOMELAND SECURITY, Bureau of Customs and Immigration Enforcement, Bureau of Citizenship and Immigration Services, Executive Office for Immigration Review, Board of Immigration Appeals, Respondents.

No. 6:03–cv–1048–Orl–31KRS.

United States District Court, M.D. Florida, Orlando Division.

Aug. 15, 2003.

Yveline Francisque Paul, Paul & Assoc., P.A., Tampa, FL, for petitioner.

Roberto H. Rodriguez, Jr., U.S. Attorney's Office, Orlando, FL, for respondents.

## ORDER

PRESNELL, District Judge.

This cause comes before the Court on Respondents' Response to the Court's Order of August 4, 2003 (Doc. 11) and Respondents' Motion for Clarification of Order of August 4, 2003 and for Modification of Said Order (Doc. 13). In that response, the Respondents indicate that they will not release Petitioner from detention because they are within the ninety (90) day removal period under 8 U.S.C. § 1231(a)(1). The Court held a hearing on the detention on August 14, 2003. Having carefully considered the petition and papers filed in this case, the argument of counsel, the applicable law, and being otherwise advised in the premises, the Court finds, for the reasons stated herein, that the Petition for Writ of Habeas Corpus should be granted and Petitioner released from custody.

## I. BACKGROUND[1]

Petitioner, Marie Jose Ulysse, is a citizen of Haiti who arrived in the United States on November 28, 1995, without inspection by the Immigration and Naturalization Services ("INS"), the United States Customs, or the United States Border Patrol. (Resp.Br.(Doc.7), at Ex. A). In 1992, Ulysse's husband died, leaving her to care for their minor son, Kevin Charles.[2] In April, 1995, Ulysse began a relationship in Haiti with Geel Odolphe, a United States citizen.[3] Odolphe and Ulysse conceived a child. After Ulysse's arrival in the United States, she resided with

---

1. The facts are undisputed and taken from the various papers filed by both Petitioner and Respondents in this case, as well as the concessions of counsel during the August 14, 2003 hearing.

2. It is unclear whether Ulysse's son resides in the United States or Haiti.

3. Odolphe received his certificate of naturalization on October 27, 1994.

Odolphe and his two daughters from his previous marriage in Tampa, Florida. On January 24, 1996, Ulysse gave birth to Odolphe's daughter, Ernslie Mica Ulysse. Shortly thereafter, as a result of difficulties in Ulysse's and Odolphe's relationship, Ulysse moved out of Odolphe's home with all three of Odolphe's children. After the couple separated, Odolphe continued to financially support Ulysse and his three children.

On May 16, 2000, the INS, seeking to remove Ulysse from the United States for entering the country without being admitted or paroled, or arriving at a place other than designated by the Attorney General, served Ulysse with a notice to appear. Ulysse appeared before an Immigration Judge on July 6, 2000. At Ulysse's request the hearing was continued to September 29, 2000, so that she could obtain counsel. After appearing on September 29, 2000, the hearing was again continued in order for Ulysse to hire counsel. Ulysse appeared before the Immigration Judge on November 30, 2000 with her counsel Kevin Mart.[4] At that time, Ulysse admitted that she entered the country without inspection and conceded removability. Haiti was designated for Ulysse as the country of removal.

On April 9, 2001, the Immigration Judge held a hearing on Ulysse's petition for political asylum. After the hearing, the Judge rendered an order, denying Ulysse's petition for political asylum and ordering her removed. On May 4, 2001, Ulysse

filed a timely notice of appeal with the Bureau of Immigration Appeals ("BIA"). Unbeknownst to Ulysse, the BIA dismissed her appeal on March 14, 2002 for her then counsel's failure to file a brief.[5] Because she was unaware of the dismissal, Ulysse did not seek review of the BIA's decision with the Eleventh Circuit Court of Appeals within the thirty-day appeal period.

Sometime in early 2003, Odolphe and Ulysse rekindled their romantic relationship. On June 3, 2003, Ulysse and Odolphe married. That same day, Ulysse moved from her Tampa apartment back to Odolphe's home. On June 6, 2003, Ulysse received a letter, addressed to her apartment address,[6] from the Department of Homeland Security ("DHS"),[7] Bureau of Immigration and Customs Enforcement ("BICE"), indicating that she had an interview on July 10, 2003. Specifically, the letter stated, "A review of your application for Asylum indicates that you may merit reconsideration. Please bring a photo ID with you for this interview." (Petition for Writ of Habeas Corpus (Doc. 1), at attach. E). On July 10, 2003, Ulysse arrived at the Tampa BICE office. However, instead of discussing reconsideration of her application, BICE placed Ulysse in custody.

Thereafter, Ulysse and Odolphe hired new counsel for Ulysse. On July 16, 2003, Ulysse's counsel filed a Motion to Reopen and Motion for Stay Pending Deportation with the BIA and the Immigration Court. (Doc. 1, at Ex. 2, attach.). The Motion to

---

4. Mart is no longer Ulysse's attorney of record.

5. According to Ulysse and her current attorney, Ulysse was never informed by the BIA or her previous attorney of the dismissal. In fact, Ulysse states that her former attorney indicated that he could not be certain that he ever notified Ulysse of the dismissal of her appeal.

6. Ulysse remained at the same address, which was on file with the Respondents, from 1999 until June 3, 2003.

7. INS became a part of DHS in March, 2003 and was later renamed. Several immigration-related bureaus are under DHS. These include the Bureau of Immigration and Customs Enforcement ("BICE") and the Bureau of Customs and Immigration Services ("BCIS").

Reopen was based upon a change in circumstances, to wit: Ulysse's marriage to Odolphe and hardship to their daughter, Ernslie Mica Ulysse, ineffective assistance of counsel, and the manner in which Ulysse was taken into custody by BICE. Counsel and Odolphe also filed all of the requisite paperwork with BCIS to adjust Ulysse's status to that of conditional resident alien.

On July 24, 2003, Ulysse filed a Petition for Writ of Habeas Corpus (Doc. 1) with this Court and served copies on DHS, BIA, BICE, BCIS, and the Immigration Court (collectively referred to as "Respondents"). At approximately 4:30 p.m., shortly after being served with Ulysse's Petition for Writ of Habeas Corpus, the BIA denied Ulysse's motion to stay deportation. (Resp.Br.(Doc.7), at Ex. F). Later that same day, this Court stayed Ulysse's deportation pending the determination of whether this Court had jurisdiction to hear Ulysse's claims.

Both Ulysse and Respondents filed briefs on the jurisdictional issue in anticipation of the hearing, which was held on August 4, 2003. At the hearing, Ulysse's attorney indicated that she had filed a motion to reopen the case with the Respondents based upon a change in circumstances and the alleged ineffective assistance of Ulysse's former counsel during

Ulysse's asylum petition and subsequent appeal. However, Ulysse's counsel expressed concern that the Respondents would deport Ulysse before ruling on the pending motion to reopen. Accordingly, the Respondents' counsel agreed to the continuance of this Court's stay of deportation (Doc. 2) until such time as Ulysse could exhaust her administrative remedies on the motion to reopen and, if necessary, prosecute an appeal of any adverse ruling to the Eleventh Circuit Court of Appeals and await a decision on such appeal.[8]

Additionally, during the hearing to determine jurisdiction, the Court inquired as to the Respondents' position on whether Ulysse would be released from custody pending exhaustion of her administrative remedies and any subsequent appeal. On August 8, 2003, Respondents notified this Court, in writing, that they were without authority under 8 U.S.C. § 1231(a)(2) to release Ulysse during the 90–day removal period because Ulysse was under a final order of removal. (Resp. Response (Doc. 11), at 1, 2–3). The Court scheduled a follow-up hearing on the matter for August 14, 2003.

## II. ANALYSIS

Ulysse's Petition for Writ of Habeas Corpus raises two distinct types of claims: (1) a claim challenging the removal order

---

8. In their Motion for Clarification and Modification (Doc. 11), the Respondents ask this Court to modify the agreed stay so that it would only remain in effect until such time as Ulysse filed an appeal with the Eleventh Circuit. The Respondents argue that they did not consent to the stay remaining in effect until the Eleventh Circuit rendered a decision. Rather, they intended that upon filing an appeal with the Eleventh Circuit, Ulysse would seek a stay with the Eleventh Circuit. The Respondents aver that this Court's stay, which was premised on the Respondents' agreement, invades the jurisdiction of the Eleventh Circuit. Nevertheless, the Respondents claim that they have no intention of

removing (deporting) Ulysse until the Eleventh Circuit renders its decision. Accordingly, the Court sees no harm in allowing the stay, as it was agreed by the Respondents on August 4, 2003, to remain in effect until the Eleventh Circuit renders an opinion, if called upon to do so. If Ulysse appeals any adverse ruling of the BIA to the Eleventh Circuit and should Respondents decide to argue the providence of the stay with the Eleventh Circuit at that time, the Eleventh Circuit has the authority to modify or cancel the stay. Because modifying the stay serves no purpose at this stage of the proceedings, the Court will deny the Respondents' Motion (Doc. 11).

and seeking relief therefrom; and, (2) a claim that her detention is unlawful because it is in contravention of the plain reading of the statute in that the removal period expired in 2002. Respondents claim that this Court lacks jurisdiction over either of these claims.

■ Federal courts retain jurisdiction to review the decisions and actions of federal agencies through petitions for habeas corpus relief under 28 U.S.C. § 2241. *I.N.S. v. St. Cyr*, 533 U.S. 289, 314, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (rejecting the government's argument that sections of the Antiterrorism and Effective Death Penalty Act and the Illegal Immigration Reform and Responsibility Act of 1996[9] stripped courts of jurisdiction over § 2241 habeas corpus petitions); *Zadvydas v. Davis*, 533 U.S. 678, 688, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("[Section] 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."); *Rosales–Garcia v. Holland*, 322 F.3d 386, 394 (6th Cir.2003) (aliens detained by INS can petition for writs of habeas corpus under 28 U.S.C. § 2241); *see Chmakov v. Blackman*, 266 F.3d 210, 215 (3rd Cir.2001) (holding that "Congress has preserved the right to habeas review for both criminal and non-criminal aliens."); *see also Boz v. United States*, 228 F.3d 1290, 1292 (11th Cir.2000) (IIRIRA does not preclude habeas review of the legality of the length of detention). The *St. Cyr* Court held that "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." 533 U.S. at 301, 121 S.Ct. 2271; *Rosales–Garcia*, 322 F.3d at 394.

■ However, the scope of a district court's jurisdiction is limited to consideration of pure questions of law and constitutional questions; it does not extend to the review of the factual findings or the discretionary decisions made by executive officers and the agencies under their control. *Calcano–Martinez v. I.N.S.*, 232 F.3d 328, 342 (2d Cir.2000) (holding that federal courts retain jurisdiction to review "purely legal statutory and constitutional claims"); *Sanusi v. I.N.S.*, 2003 WL 21696945, *1 (E.D.N.Y. July 15, 2003). Such discretionary decisions may only be reviewed for violations of the Constitution or laws and treaties of the United States. 28 U.S.C. § 2241(c)(3); *see Duldulao v. United States Parole Commission*, 461 F.Supp. 1138, 1141 (S.D.Fla.1978); *Sanusi*, 2003 WL 21696945, at *1; *Sulaiman v. Attorney General*, 212 F.Supp.2d 413, 416 (E.D.Pa.2002) ("Only questions of pure law will be considered on § 2241 habeas review. Review of factual or discretionary issues is prohibited.") (relying on *Sol v. I.N.S.*, 274 F.3d 648, 651 (2d Cir.2001), *cert. denied*, 536 U.S. 941, 122 S.Ct. 2624, 153 L.Ed.2d 807 (2002) and *Bowrin v. I.N.S.*, 194 F.3d 483, 490 (4th Cir.1999)).

■ This Court finds that it lacks jurisdiction over Ulysse's challenge to the removal order and the relief she seeks through her motion to reopen. Because her claims in the motion to reopen represent a challenge to the discretionary authority of the Respondents, Ulysse must exhaust her administrative remedies before pursuing these claims in the courts. *See Wang v. Ashcroft*, 260 F.3d 448, 452 (5th Cir.2001); *see also In re Soliman*, 134 F.Supp.2d 1238, 1245 (N.D.Ala.2001) (concluding that IIRIRA precludes a district court form exercising habeas corpus jurisdiction over petitions challenging immigra-

9. The Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), §§ 305– 306, Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996) applies to this case.

tion removal orders, removal proceedings, or detention pending removal). However, Ulysse's claim that she is being unlawfully detained because Respondents have violated the removal statute is a pure question of law, and therefore, clearly within the habeas jurisdiction of this Court. *Zadvydas,* 533 U.S. at 688, 121 S.Ct. 2491.

In order to determine the legality of Ulysse's detention, this Court must review the applicable statutes. Title 8, section 1231(a)(1)(A) provides, "the Attorney General shall remove the alien from the Untied States within a period of 90 days (in this section referred to as the 'removal period')." *Benitez v. Wallis,* 337 F.3d 1289, 1293–94 (11th Cir.2003); *see* 8 C.F.R. § 241.3. The 90–day removal period is to begin

> on the latest of the following: (i) The date the order of removal becomes administratively final. (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order. (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

8 U.S.C. § 1231(a)(1)(B). In other words, for aliens who are not serving criminal sentences, the "removal period" begins on the later of either the date on which the order of removal becomes administratively final, or the date of the final order of a reviewing court.[10] *In re Soliman,* 134 F.Supp.2d at 1246 (citing 8 U.S.C. § 1231(a)(1)(B)). Aliens awaiting removal must be detained during the 90–day removal period. *Id.* (citing 8 U.S.C. § 1231(a)(2)). Therefore, the DHS has a statutory duty to effect removal within the 90–day period, if possible. *Xi v. I.N.S.,* 298 F.3d 832, 840 n. 6 (9th Cir.2002).[11]

The statute further provides that, if the DHS is unable to effect the removal of the alien within the removal period, the alien is to be released subject to supervision. *In re Soliman,* 134 F.Supp.2d at 1246 (citing 8 U.S.C. § 1231(a)(3)). Such supervision includes requiring the alien to periodically appear before an immigration officer for identification, to submit to medical and psychiatric exams, to give other personal information under oath, and to obey reasonable written restrictions on the alien's conduct or activities. *Id.* at 1246–47 (citing 8 U.S.C. § 231(a)(3)(A)-(D)).

**10.** The applicable regulation, 8 C.F.R. § 241.1, further provides that a removal order becomes final "upon expiration of the time allotted for an appeal if the [alien] does not file an appeal within that time." The regulation more fully states that the immigration judge's order of removal becomes final upon the occurrence of one of the following circumstances:

> (a) Upon dismissal of an appeal by the [BIA]; (b) Upon waiver of appeal by the [alien]; (c) Upon expiration of the time allotted for an appeal if the [alien] does not file an appeal within that time; (d) If certified to the [BIA], upon the date of the subsequent decision ordering removal; (e) If an immigration judge orders an alien removed in the alien's absence, immediately upon entry of such order; or (f) If an

> immigration judge issues an alternate order of removal in connection with a grant of voluntary departure, upon overstay of the voluntary departure period except where the [alien] has filed a timely appeal with the Board. In such a case, the order shall become final upon an order of removal by the Board or the Attorney General, or upon overstay of any voluntary departure period granted or reinstated by the Board or the Attorney General.
>
> *Id.*

**11.** The Court recognizes that the removal period can be extended beyond 90 days, if the alien thwarts or hinders the removal process. *See* 8 U.S.C. § 1231(a)(1)(c). However, this provision is not applicable here because Respondents made no effort to remove Ulysse within the 90–day period.

Under limited circumstances, certain aliens may be detained beyond the removal period. *Id.* at 1247. For example, 8 U.S.C. § 1231(a)(6), pertaining to "inadmissible or criminal aliens," provides:

An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

*Id.* at 1247 (citing 8 U.S.C. § 1231(a)(6)). Thus, the Attorney General may detain beyond the 90–day removal period aliens who are inadmissible, aliens who have committed aggravated felonies, aliens who are otherwise dangerous, and aliens who are a flight risk. *Benitez,* 337 F.3d 1289, 1293–94.[12]

■■■■ Respondents state that under their interpretation of the statute, which they claim is entitled to deference from this Court, the 90–day removal period did not begin until Ulysse was taken into custody. Respondents, however, cite no case law directly on point for this interpretation of the statute. The interpretation of a federal statute by a federal administrative agency is reviewed by the courts under the *Chevron* doctrine. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the *Chevron* doctrine, the court first looks to see if "Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. Where the intent of Congress is clear, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If, on the other hand, the statute is silent or ambiguous on the question, the court must then determine if the agency's answer to the question is based on a permissible reading of the statute. In this instance, Congress has spoken to the issue and its intent was clear.

In enacting IIRIRA, Congress intended for inadmissible, excludable, or removable aliens to be deported within 90 days, if possible. This is evidenced not only by the clear language of the statute, but also by the change in statutory language in 1996. Section 305 of IIRIRA replaced former 8 U.S.C. § 1252(c) with new 8 U.S.C. § 1231. *Ncube v. I.N.S. Dist. Directors and Agents,* 1998 WL 842349, *6 (S.D.N.Y. Dec.2, 1998). This change reduced the amount of time that the Attorney General has to deport an alien from six months to 90 days, but extended the removal period if the alien does not cooperate. *Id.* (citing *Channer v. Hall,* 112 F.3d 214, 215–16 (5th Cir.1997); *Kai v. I.N.S.,* 1997 WL 786946, at *2 (S.D.N.Y. Dec.22, 1997)).

Under the Respondents' interpretation of the statute, Respondents could arbitrarily trigger commencement of the removal period by simply waiting to take an alien into custody. This interpretation, however, flies in the face of the plain reading of the statute and Congress' intent that removal of the alien, or at least a bona fide attempt to remove the alien, should be done within 90 days of the removal order being final. Therefore, the Court finds that Respondents' interpretation of the statute is clearly erroneous. *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778 (concluding that agency regulations are "given controlling weight, unless they are arbitrary, capricious, or manifestly contrary to

---

**12.** Respondents do not suggest that Ulysse has committed any crimes, is dangerous, or poses a risk of flight.

the statute."). If Respondents are allowed the liberty to decide when they will comply or even attempt compliance with the statutes that they are charged with enforcing, the statutory scheme will be rendered a nullity and Congress' intent to remove illegal aliens as quickly as possible will be thwarted. Federal agencies should not and do not have such power.

■ Here, the Respondents concede that the order of removal became final on March 14, 2002. (Resp.Br.(Doc.7), at 2–3) and the appeal period expired thirty days later, on April 14, 2002. Furthermore, because Ulysse has no criminal history, 8 U.S.C. § 1231(a)(1)(B)(iii) does not apply. Likewise, since Ulysse did not appeal the BIA's dismissal of her appeal of the order of removal and BIA has not ruled upon her motion to reopen, the removal order has not yet been judicially reviewed. Also, this Court stayed the matter pending a determination of jurisdiction; it did not enter a stay pending review of the removal order. Then, only after the Respondents agreed that a stay was appropriate pending Ulysse's exhaustion of administrative remedies and any determination on an appeal, did this Court order the stay to remain in effect. Hence, 8 U.S.C. § 1231(a)(1)(B)(ii) is inapplicable. Therefore, this Court finds that the 90–day period of removal began on April 14, 2002 and lapsed more than a year prior to Ulysse's detention.

Moreover, Respondents have expressed no reason for their almost 17–month delay in detaining Ulysse and removing her back to Haiti, in contravention of the statute.[13] Nor is any reason to suspend the removal period, pursuant to 8 U.S.C. § 1231(a)(1)(C), found in the record. In this regard, Ulysse did not act to prevent her removal following entry of the BIA's dismissal order or attempt to secret herself from the Respondents. Furthermore, Respondents have acknowledged that they never attempted to contact Ulysse or her former attorney regarding her removal. Rather, they admitted, at the hearing on August 14, 2003, that since DHS began overseeing immigration matters, it was the policy and practice of the Respondents, under "Operation Skyway," to engage in artifice and trickery to remove, as "efficiently and expeditiously as possible," the approximately 400,000 aliens who are presently subject to removal orders.[14] This course of action was taken in lieu of giving these aliens the opportunity for voluntary surrender and in the instant case was not done expeditiously.

Accordingly, the Court finds that the Respondents are without statutory authority to detain Ulysse because the 90–day removal period has expired. Indeed, 8 U.S.C. § 1231(a)(3) contemplates release from detention after the removal period has expired under supervision of the Respondents pursuant to regulations prescribed by the Attorney General. *Zadvydas*, 533 U.S. at 683, 121 S.Ct. 2491. Those regulations can be found at 8 C.F.R. § 241.4(e) and the factors espoused therein support Ulysse's release. For example, Ulysse has no criminal history, has signifi-

---

13. The Court also questions what possible policy objective would be accomplished by incarcerating Ulysse, at the taxpayers' expense, while her administrative proceeding and judicial review are in progress. Obviously, Respondents have no concern that Ulysse is a flight risk or a danger to society because they made no effort to remove or detain her sooner.

14. Respondents characterize these aliens who are subject to removal orders as fugitives or absconders. This classification is especially troublesome in this case because at no time did Ulysse attempt to hide or abscond, as she was unaware of the finality of her removal order. Also, Respondents could have contacted her because she remained at her address of record from 1999 until her marriage in June, 2003.

cant ties to the community, has a stable residence, is married to a United States citizen, has a minor child who is a United States citizen, is not a danger to society, and apparently does not present a flight risk.

### III. CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that:

(1) Petitioner's Petition for Writ of Habeas Corpus (Doc. 1) is **GRANTED.** *Petitioner shall be released from custody by 4:00 p.m., Thursday, August 14, 2003.* Petitioner shall not be taken into custody by Respondents unless there is a change in circumstances, as that term has been construed by the courts, Petitioner violates the conditions of her release, she receives an adverse ruling from the Eleventh Circuit, or the Eleventh Circuit cancels the agreed stay entered in this case.

(2) The Respondents' Motion for Clarification and Modification (Doc. 11) is **DENIED.**

(3) The Clerk is directed to close this file.