

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-29-2003

# Sierra v. Romaine

Precedential or Non-Precedential: Precedential

Docket No. 02-2826

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Sierra v. Romaine" (2003). *2003 Decisions.* Paper 153.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/153

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 29, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2826

ROLANDO M. SIERRA, SR.,

*Appellant*

v.

D. ROMAINE, Warden; IMMIGRATION &
NATURALIZATION SERVICE; JOHN ASHCROFT,
Attorney General of the United States of America

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 00-00852)
Honorable James M. Munley, District Judge

Argued September 9, 2003

BEFORE: BARRY, BECKER, and GREENBERG,
*Circuit Judges*

(Filed: October 29, 2003)

Christopher W. Wasson (argued)
Barak A. Bassman
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pa. 19103-2799

*Attorneys for Appellant*

Robert D. McCallum, Jr.
Assistant Attorney General
United States Department of Justice
Civil Division
Linda S. Wernery
Senior Litigation Counsel
United States Department of Justice
Thankful T. Vanderstar
Laura L. Flippin (argued)
United States Department of Justice
Civil Division
Office of Immigration Litigation
Post Office Box 878
Ben Franklin Station
Washington, DC 20044

*Attorneys for Appellees*

Judy Rabinovitz
American Civil Liberties Union
 Foundation
Immigrants' Rights Project
125 Broad Street
New York, NY 10004-2400
Lucas Guttentag
Liliana M. Garces
American Civil Liberties Union
 Foundation
Immigrants' Rights Project
405 14th Street, Suite 300
Oakland, CA 94612

*Attorneys for Amicus Curiae*
*American Civil Liberties Union*

---

## OPINION OF THE COURT

---

GREENBERG, *Circuit Judge.*

### I.  FACTUAL AND PROCEDURAL HISTORY

This matter comes on before this court on Rolando

Sierra's appeal from an order entered in the district court on June 18, 2002, denying his petition for a writ of habeas corpus.[1] Sierra is a 41-year-old Cuban national who arrived in the United States in 1980 as part of the Mariel boatlift during which over 125,000 Cubans crossed by boat from Mariel harbor in Cuba to the United States.[2] *See* JA 7. Immigration officials stopped Sierra and most Mariel Cubans at the border as they were "excludable" under the then effective immigration law.[3] Although excludable aliens

---

1. Sierra filed his petition for habeas corpus in the district court under 28 U.S.C. § 2241. *See* JA 22. In *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271 (2001), the Supreme Court concluded that aliens the INS has detained can petition for writs of habeas corpus under 28 U.S.C. § 2241 — whether they are detained pursuant to the pre-1996 statutory regime, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), or the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996). *See Rosales-Garcia v. Holland*, 322 F.3d 386, 394 (6th Cir.) (en banc), *cert. denied*, 123 S.Ct. 2607 (2003); *see also Zadvydas v. Davis*, 533 U.S. 678, 688, 121 S.Ct. 2491, 2498 (2001) ("§ 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention.").

2. Sierra had been incarcerated in Cuba for petty theft immediately preceding his departure to the United States. *See* JA 74.

3. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) substantially altered the landscape in immigration law and brought about a shift in basic immigration terminology. *Chi Thon Ngo v. INS*, 192 F.3d 390, 395 n.4 (3d Cir. 1999). Pre-IIRIRA the law referred to "excludable" aliens as "those who were ineligible for admission or entry into the United States." *Id.* "Excludable" aliens could be subject to exclusion proceedings; " '[d]eportation' proceedings, in contrast, were brought against those aliens who had gained admission into the country." *Id.* "The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission." *Landon v. Plasencia*, 459 U.S. 21, 25, 103 S.Ct. 321, 325 (1982). In practice, however, the technical linguistic distinction under pre-IIRIRA law seems not to have been followed in all cases. For example, in "exclusion proceedings" an immigration judge on January 6, 1992, ordered that "the applicant [Sierra] be excluded and deported as charged." JA 50. IIRIRA "refers to 'inadmissible' aliens in the place of 'excludable' aliens. Although there are still separate grounds of 'inadmissibility' and 'deportability,' the

such as Sierra have not "entered" the country for the purposes of immigration law, the government nevertheless permitted him as well as other Mariel Cubans to make a physical entry into the United States pursuant to the Attorney General's authority under 8 U.S.C. § 1182(d)(5)(A) to grant immigration parole.[4]

Following Sierra's physical entry into the United States he engaged in a series of serious criminal acts in this country. Thus, he was convicted, *inter alia*, of carrying a deadly weapon and of theft in the District of Columbia in 1986 and of daytime housebreaking and of theft in Maryland in 1990 and 1991.[5] JA 7. As a result of these convictions, the Immigration and Naturalization Service ("INS") quite naturally and appropriately revoked Sierra's immigration parole. *See* JA 7. On January 6, 1992, after denying Sierra's applications for asylum and withholding of deportation, an immigration judge ordered that he be excluded and deported from the United States. JA 49-50. Sierra appealed the decision of the immigration judge to the Board of Immigration Appeals which summarily dismissed the appeal on May 6, 1992. JA 52.

Sierra should have been deported immediately but unfortunately the Cuban government generally has refused

---

distinction now turns on whether an alien has been 'admitted' to the United States, rather than on whether the alien has gained 'entry.' " *Ngo*, 192 F.3d at 394 n.4. An alien who does not enter the United States legally is not "admitted." 8 U.S.C. § 1101(a)(13)(A). "Inadmissible" aliens, therefore, include aliens who have not entered the United States (formerly excludable) and those who entered illegally (formerly deportable). 8 U.S.C. § 1182(a)(6). Both "inadmissible" and "deportable" aliens are now subject to removal proceedings. 8 U.S.C. § 1229a(3).

4. 8 U.S.C. § 1182(d)(5)(A) stipulates that "such parole of such alien shall not be regarded as an admission of the alien." *Rosales-Garcia v. Holland*, 322 F.3d 386, 391 n.2 (6th Cir. ) (en banc), *cert. denied* 123 S.Ct. 2607 (2003). The concept that aliens who are physically present within the United States but nonetheless technically are considered to be at the border is known as the "entry fiction" doctrine. *See id.*

5. Sierra's convictions for theft and breaking and entering are aggravated felonies under the Immigration and Nationality Act. *See* 8 U.S.C. § 1101(a)(43).

to cooperate in the return of Mariel Cubans and specifically has declined to receive Sierra. *See* JA 102. The INS therefore has held Sierra in custody for most of the last 11 years detaining him in various federal penitentiaries operated by the Bureau of Prisons, including the facility at Lewisburg, Pennsylvania, at the time he brought this action, and currently the facility at Lompoc, California.

Since his detention and throughout the time Sierra has been in INS custody, the INS annually has reconsidered releasing him on immigration parole in accordance with 8 C.F.R. § 212.12 (2003), which governs the cases of Mariel Cubans who remain in the Attorney General's custody. Pursuant to these regulations, a Cuban Review Panel makes a recommendation to the INS Associate Commissioner for Enforcement,[6] who has the discretion to approve parole. *Sierra v. INS*, 258 F.3d 1213, 1216 (10th Cir. 2001). The INS denied Sierra parole in 1992 because of his "tendency to engage in criminal activities as reflected by [his] extensive criminal record." *Id.* On April 15, 1994, the INS released Sierra to a halfway house, but six months later revoked his parole by reason of his failure to abide by the conditions of his release. Thus, he was returned to the custody of the INS. *Id.* The INS denied Sierra parole in 1995, 1996, and 1997. *Id.* While detained in prison, he has been disciplined for numerous incidents, such as insolence, refusing an order, threatening others, and minor assaults. *Id.*

On July 28, 1998, a Cuban Review Panel recommended Sierra's parole to a halfway house, noting that he had not been involved in any disciplinary incidents in 1998. *Id.* That decision, however, was revoked due to Sierra's involvement in a fight. JA 8. A panel conducted an interview on March

---

6. In order to recommend that a detainee be paroled, the panel members, two members of the INS professional staff, must conclude that the detainee is presently non-violent, likely to remain non-violent, and not otherwise likely to violate any conditions in the event of his parole. *Chavez-Rivas v. Olsen*, 207 F. Supp. 2d 326, 329 (D.N.J. 2002). There is a list of seven, apparently non-exclusive, factors to guide a Cuban Review Panel in reaching its determinations. *Id.* If a Cuban Review Panel cannot recommend parole based solely on the detainee's paper record, it must interview the detainee. *Id.*

18, 1999, following which it declined to recommend parole, finding that Sierra was "violent and [would] remain violent if released." *Id.* Though a Cuban Review Panel interviewed Sierra again on September 13, 2000, and recommended him for parole, this recommendation was withdrawn on May 13, 2002, after Sierra was disciplined for disruptive behavior in October 2001. *See* JA 157.

Prior to filing his current petition for a writ of habeas corpus, Sierra had filed several other petitions seeking habeas relief. While he was incarcerated in Florence, Colorado, he filed an action in the United States District Court for the District of Colorado, challenging the Cuban Review Panel's 1998 withdrawal of parole based on the fighting incident. *See* JA 9. The district court, however, dismissed the action by an order dated August 9, 1999, and in August 2001, the Court of Appeals for the Tenth Circuit affirmed the district court's order. *Sierra*, 258 F.3d at 1220. On January 7, 1997, Sierra filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Alabama challenging his detention claiming that he had not committed an aggravated felony, his incarceration with felons violated his rights, and the Cuban Review Panel had refused to release him from custody. *See* JA 108. Sierra filed a similar action in the United States District Court for the District of Columbia on March 24, 1998. *See* JA 9. The District of Columbia court transferred that action to the Northern District of Alabama which consolidated it with the case pending before it and then dismissed both cases.[7] *See* JA 9. The Court of Appeals for the Eleventh Circuit affirmed the order of the district court in an unpublished memorandum on July 17, 2002. *Sierra v. Sivley*, No. 00-12508, 46 Fed.

---

7. The district court adopted the findings and conclusions of a magistrate judge who recommended that the court dismiss Sierra's petition for lack of jurisdiction pursuant to section 242(g) of the Immigration and Nationality Act, 8 U.S.C. § 1252(g), because "[d]etention of aliens pending repatriation constitutes an 'action by the Attorney General' incident to the execution of removal orders" and thus is barred from judicial review. JA 115. Alternatively, the magistrate judge recommended dismissal on the merits, concluding that, as an excludable alien, Sierra "has no right to be set free in this country." JA 118.

App. 617, 2002 WL 1798861 (11th Cir. July 17, 2002) (table).

Sierra filed the present petition for a writ of habeas corpus on May 15, 2000, in the Middle District of Pennsylvania. *See* JA 6. In his petition Sierra maintained that the INS improperly denied him visits with his family and improperly denied him parole. *See* JA 9. In proceedings before the district court Sierra argued that he was being detained in violation of the Fifth and Sixth Amendments of the Constitution, contentions he has abandoned,[8] and that the Supreme Court's then recent decision in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491 (2001), which we describe at length below, prohibited his potential indefinite detention. *See* JA 10-11. In an order dated July 9, 2001, the district court ordered the parties to file supplemental memoranda of law addressing the lawfulness of Sierra's imprisonment in light of *Zadvydas*. JA 4-5. In a memorandum dated May 17, 2002, the district court held that Sierra's imprisonment was lawful and that the restrictions *Zadvydas* established with respect to detention of resident aliens were not applicable in his case. Nevertheless, the district court ordered the INS to review his parole status within 30 days. *See* JA 12-17. In a memorandum and order dated June 18, 2002, the court revoked its earlier requirement that the INS review Sierra's parole status in 30 days as the INS provided the court with evidence that it had made periodic parole reviews of Sierra's status. JA 18-21. On June 27, 2002, Sierra filed a timely notice of appeal from the June 18, 2002 order which appeal also encompasses the May 17, 2002 order. JA 1.

## II.  DISCUSSION

### A. Jurisdiction and Standard of Review

The district court had jurisdiction under 28 U.S.C.

---

8. *See* Reply Br. of appellant at 1 ("this case is about the application of a *statute* as interpreted by the Supreme Court and *not* Constitutional law"). Nor does Sierra currently maintain that he improperly is being denied visits with his family or that his continued detention violates international law.

§ 2241 and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We exercise plenary review over the district court's legal conclusions and ordinarily would review its findings of fact under a clearly erroneous standard. *See Ruggiano v. Reish*, 307 F.3d 121, 126 (3d Cir. 2002). Here, however, inasmuch as the relevant facts are undisputed, our entire review is plenary.

B. The Statutory Basis for Sierra's Current Detention

The parties dispute the statutory authority for Sierra's current detention.[9] Sierra argues that "8 U.S.C. § 1231(a)(6) is the statute authorizing [his] *current* imprisonment." Br. of appellant at 14. The government maintains that former 8 U.S.C. §§ 1226(e), 1225(b), 1227(a) and 1182(d)(5)(A) (1994) and not current section 1231(a)(6) govern his detention. Br. of appellee at 20.

Congress enacted 8 U.S.C. § 1231(a)(6) (hereinafter "section 1231(a)(6)") as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996). Although IIRIRA had a general effective date of April 1, 1997, *see* IIRIRA § 309(a) (codified at 8 U.S.C. § 1101 note (2000)), a transition section specifies that certain of its provisions do not apply "in the case of an alien who is in exclusion or deportation proceedings before [April 1, 1997]." *Id.* § 309(c)(1) (hereinafter "section 309(c)(1)").[10] According to the government, section 309(c)(1) of IIRIRA precludes this court from applying IIRIRA to Sierra, an unadmitted,

---

9. The district court did not address this issue.

10. The general rule of inapplicability in section 309(c)(1) of IIRIRA provides as follows:

(c) TRANSITION FOR CERTAIN ALIENS. —

(1) GENERAL RULE THAT NEW RULES DO NOT APPLY. — Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings before [April 1, 1997,] —

(A) the amendments made by this subtitle shall not apply, and

(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

inadmissible alien ordered excluded and deported prior to its effective date.

In contrast Sierra contends that IIRIRA does apply and that section 1231(a)(6) governs this action because: (1) the most natural reading of section 309(c)(1) is that it applies only to matters at issue through the pendency of proceedings and not to post-final-order detention determinations; (2) in *Zadvydas* the Supreme Court applied section 1231(a)(6) to a petitioner who had been placed in deportation proceedings and ordered deported prior to April 1, 1997; and (3) in *Zadvydas*, as well as in other cases, the INS has argued that section 309(c)(1) only applies to aliens in *pending* deportation or exclusion proceedings, not to post-final-order detention determinations.

As we will discuss in more detail below, several courts of appeals have found that section 1231(a)(6) governs the detention of aliens in procedural circumstances similar to those of Sierra.[11] *See Martinez Vazquez v. INS*, No. 03-35026, ___ F.3d ___, 2003 WL 22244774, at *3 (9th Cir. Oct. 1, 2003); *Rosales-Garcia v. Holland*, 322 F.3d 386, 401-03 (6th Cir.) (en banc), *cert. denied*, 123 S.Ct. 2607 (2003); *Zadvydas v. Underdown*, 185 F.3d 279, 286-87 (5th Cir. 1999), *vacated sub nom. on other grounds*, *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491 (2001).

(a) The language of section 309(c)(1)

IIRIRA's transition provision, section 309(c)(1), surely is ambiguous. Uncertainty arises from its present tense language describing an alien who "is" in proceedings "before" April 1, 1997. As the Court of Appeals for the Fifth Circuit stated in *Zadvydas v. Underdown*, "[t]he problem is

11. In *Chi Thon Ngo v. INS*, 192 F.3d 390 (3d Cir. 1999), we faced the question of whether section 1231(a)(6) applied to an alien who, like Sierra, was ordered excluded and deported several years before IIRIRA's effective date. Noting that the "adoption of the AEDPA and IIRIRA by Congress in 1996, together with the IIRIRA Transitional Rules that expired in October 1998, have created a complex assortment of amended and repealed provisions that is frequently baffling," we expressly reserved judgment on the question based on our conclusion that the petitioner's detention was authorized regardless of which statutory regime applied. *Id.* at 395 n.5.

created by the statute's usage of 'before,' which might be read to imply that the statute only affects those that were free of any involvement in deportation [or exclusion] proceedings prior to the effective date." 185 F.3d at 286 n.7.

As originally enacted, the transition rule in section 309(c)(1) applied "in the case of an alien who is in exclusion or deportation proceedings as of [April 1, 1997]." (Emphasis added.)[12] But 11 days after IIRIRA's enactment, a technical amendment struck and replaced the term "as of " with the term "before." *See* Extension of Stay in the United States for Nurses Act, Pub. L. No. 104-302, § 2, 110 Stat. 3656 (1996). The government argues that this technical amendment "made clear that IIRIRA's provisions do not apply to aliens who were placed in administrative proceedings *before* IIRIRA's general effective date of April 1, 1997." *See* Br. of appellee at 24. It is not clear, however, that Congress intended the amendment to have that broad effect, though we acknowledge that if Congress had not substituted "before" for "as of " it would be clearer that section 1231(a)(6) would apply in cases such as this one completed before IIRIRA's effective date. As the Court of Appeals for the Fifth Circuit explained in *Zadvydas v. Underdown,* "[t]he confusing 'before' was . . . the product of what was labeled as a 'technical' amendment established by the Hatch-Kennedy amendment to the H-1A Nursing Bill . . . . Nothing indicates what the goal of this amendment was, and the failure of the amendment to change the surrounding language makes its intended purpose unclear." 185 F.3d at 287 n.7 (internal citation omitted).

The Court of Appeals for the Sixth Circuit's en banc decision in *Rosales-Garcia* and the Court of Appeals for the Fifth Circuit's decision in *Zadvydas v. Underdown* support Sierra's position that section 309(c)(1) applies only to

---

12. Originally the title of section 309(c) of IIRIRA read "Transition For Aliens In Proceedings." Section 203(a)(2) of the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193, 2198 (1997), amended by Pub. L. No. 105-139, 111 Stat. 2644 (1997), changed the title to its current form which is "Transition For Certain Aliens."

matters relating to ongoing deportation or exclusion proceedings and not to post-final-order detention determinations so that section 1231(a)(6) is applicable in this case.[13] *Rosales-Garcia* involved Mariel Cubans who, like Sierra, were unadmitted aliens ordered excluded and deported before IIRIRA's effective date. The court of appeals found that the present tense language of section 309(c)(1) and the Supreme Court's language in *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271 (2001), and other cases indicated that section 309(c)(1) applies only to proceedings pending on April 1, 1997. *Rosales-Garcia*, 322 F.3d at 402-03. Accordingly, the court rejected the government's argument that pre-IIRIRA law should apply and instead concluded that section 1231(a)(6) governed appellants' imprisonment because neither of their "exclusion proceeding[s] was pending on April 1, 1997."[14] *Id.* at 403. In *Zadvydas v. Underdown,* the Court of Appeals for the Fifth Circuit, while noting that the statute "is not a model of clarity" with respect to its application to an alien ordered deported prior to the IIRIRA's effective date, agreed with the parties that IIRIRA applies to all aliens who are not "in proceedings" on the statute's effective date. *See* 185 F.3d at 286-87.[15]

In support of his argument that IIRIRA applies unless the immigrant in question was in pending immigration proceedings on April 1, 1997, Sierra also points to *St. Cyr*

13. In *Zadvydas* the Supreme Court did not reverse the court of appeal's determination that section 1231(a)(6) was the applicable statute. Indeed, without addressing the issue, the Supreme Court assumed in *Zadvydas* that section 1231(a)(6) was applicable.

14. The dissenting judges in *Rosales-Garcia* did not accept the government's argument that section 1231(a)(6) was inapplicable. *See Rosales-Garcia*, 322 F.3d at 416-21 (Boggs, J., dissenting).

15. Though the Supreme Court applied IIRIRA in *Zadvydas*, it did not explain why it did so. *See Rosales-Garcia*, 322 F.3d at 401. Inasmuch as the Court in *Zadvydas* did not discuss the application of IIRIRA to Zadvydas, we cannot simply assume that such application is appropriate for all aliens ordered deported or excluded before April 1, 1997. *Id.* However, there are other reasons that IIRIRA is the appropriate statute. Most significantly, this is the best interpretation of section 309(c)(1). In addition, as we will discuss in more detail below, the government until recently endorsed this interpretation.

in which the Supreme Court noted that "[s]ection 309(c)(1) is best read as merely setting out the *procedural* rules to be applied to removal proceedings pending on the effective date of the statute." 533 U.S. at 318, 121 S.Ct. at 2289. In *Rosales-Garcia* the court quoted this language and pointed out that "The *St. Cyr* Court also noted that 'the Conference Report expressly explained "[section 309(c)] provides for the transition to new *procedures* in the case of an alien already in exclusion or deportation proceedings on the effective date." 322 F.3d at 402 (citations omitted). The court of appeals concluded that "[i]n other words, according to the Supreme Court, § 309(c) provides only that IIRIRA does not apply to removal *proceedings* that were *pending* on April 1, 1997." *Id.*; *see also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487, 119 S.Ct. 936, 945 (1999) (referring to "§ 309(c)(1)'s general rule" that IIRIRA's provisions "do not apply to pending cases").

Section 309(c)(1)(B), which provides that "the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments," i.e., under pre-IIRIRA law, also supports this interpretation of section 309(c)(1). As amicus American Civil Liberties Union ("ACLU") points out, the focus on "proceedings" and "judicial review thereof" in section 309(c)(1)(B) confirms that section 309(c)(1) governs issues relating to the determination of excludability or deportability, not post-final-order detention that occurs thereafter and is unrelated entirely to the proceedings. *See* Br. of amicus at 12-13.

(b) INS's shifting position on the applicable law

In its brief the government argues that "the INS has consistently taken the position that, pursuant to section 309(c)(1) of IIRIRA, the pre-IIRIRA law applies to the detention of *excludable* aliens whose immigration proceedings were initiated prior to April 1, 1997." Br. of appellee at 27. In addition, according to the government, "to the extent this Court finds IIRIRA § 309(c) ambiguous, it should accord *Chevron*[16] deference to the INS's interpretation." Br. of appellee at 28.

16. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782 (1984).

Contrary to the government's contention that it "consistently [has] taken the position that, pursuant to § 309(c)(1) of IIRIRA, the pre-IIRIRA law applies to the detention of *excludable* aliens whose immigration proceedings were initiated prior to April 1, 1997," the government previously has argued that IIRIRA, not pre-IIRIRA law, applies to the detention of excludable aliens whose immigration proceedings were initiated and *concluded* prior to April 1, 1997. Most significantly, in Sierra's prior litigation challenging the parole revocation process, the government acknowledged before the Court of Appeals for the Tenth Circuit that IIRIRA applied. *See Sierra*, 258 F.3d at 1216-17 n.2 ("The parties agree that IIRIRA applies to this case, and for purposes of this appeal we assume it does, although the matter is not free from doubt."); *see also Benitez v. Wallis*, 337 F.3d 1289, 1293 n.13 (11th Cir. 2003) (In a case involving a Mariel Cuban found excludable and deportable prior to IIRIRA's effective date, "in the district court proceedings, the government relied on IIRIRA, did not assert that pre-IIRIRA rules applied, and did not dispute (in any way) the district court's application of IIRIRA.").

In addition, the INS has argued in cases involving deportable aliens that section 309(c)(1) applies only when proceedings are in progress. The government advanced this exact reason before the court of appeals in *Zadvydas v. Underdown* to justify application of section 1231(a)(6) to the petitioner, who had been placed in proceedings prior to April 1, 1997. In that case the government argued that the "exception in section 309(c)(1) . . . only applies to 'proceedings' in progress. Because Mr. Zadvydas already has a final deportation order and his administrative proceedings have been concluded, the exception found in 309(c)(1) does not apply to his case, and the effective date provision of § 309(a) governs."[17] *See* Respondents-

_____

17. The government attempts to explain the position it took in *Zadvydas v. Underdown* by arguing that because of an alleged ambiguity created by the various statutory changes, both the pre-1996 and post-1996 detention statutes governed Zadvydas' imprisonment. *See* Br. of appellee at 22. As the ACLU points out, this argument is not persuasive. *See* Br.

Appellants' Supplemental Brief in *Zadvydas v. Underdown* at 10, No. 97-31345 (5th Cir.) (filed Apr. 22, 1999) (copy attached to amicus brief as Exh. A); *see also Zadvydas v. Underdown*, 185 F.3d at 286-87 (agreeing with the government's position that IIRIRA governed Zadvydas' detention); *In re Nai Meng Saelee*, 22 I. & N. Dec. 1258 n.61 (2000).

As the ACLU also points out, following the Supreme Court's decision in *Zadvydas* the government continued to advance the same interpretation of section 309(c)(1) to justify application of section 1231(a)(6) to an alien placed in deportation proceedings prior to IIRIRA's effective date and ordered deported thereafter. *See* Br. of amicus at 16. The government argued before the Court of Appeals for the Eleventh Circuit that section 309(c)(1) did not govern the alien's detention because he was subject to a final order and no longer was in deportation "proceedings." *See* Brief for respondent/appellees in *Al Najjar v. Ashcroft* at 13-14, No. 02-11153-JJ (11th Cir.) (filed May 21, 2002) (copy attached to amicus brief as Exh. B). In further support of its position, the government argued that Congress intended that the same detention rules would apply to individuals subject to final orders regardless of the date of those orders, stressing that: "[B]ecause custody decisions are necessarily prospective, it is logical that Congress intended one set of detention rules to apply to all aliens with final orders awaiting deportation or removal."[18] *Id.* at 14. Though

of amicus at 17-22; *see also Chavez-Rivas v. Olsen*, 207 F. Supp. 2d 326, 332-33 (D.N.J. 2002) ("At oral argument, counsel for the Respondents claimed that the INS's position in *Zadvydas* applied only to *deportable* criminal aliens. I fail to see the relevance of that distinction here, and, in any event, the INS has nothing at all to distinguish its position in *Sierra*, wherein the petitioner was, like Chavez-Rivas, inadmissible. Nor is there any evidence that the INS's conclusion is based on underlying policy concerns, or indeed, on reasoned deliberation of any kind.") (citation omitted).

18. The ACLU also points out that the government has maintained that the newly enacted "reinstatement" of removal provision, IIRIRA § 241(a)(5), applies to aliens in proceedings before IIRIRA's effective date because those aliens were no longer in ongoing proceedings and section

the procedural posture of *Al Najjar* differs from that here inasmuch as in that case the deportation order was entered after IIRIRA's effective date, the government's position in *Al Naijar* is somewhat inconsistent with its position here.

Notwithstanding its position in these cases, the government recently has abandoned this interpretation of section 309(c)(1) and now contends that IIRIRA has a more limited application. Thus, before the Court of Appeals for the Sixth Circuit in *Rosales-Garcia*, the government argued that section 309(c)(1) precludes application of section 1231(a)(6) in all cases of aliens excluded prior to IIRIRA's effective date. *See* 322 F.3d at 401 (noting that "[a]ccording to the government, § 309(c)(1) of IIRIRA precludes [the court] from applying IIRIRA to an alien excluded prior to the statute's effective date.").[19]

We do not suggest that a governmental agency may not change its interpretation of a statute and, indeed, we recognize that ordinarily it should make such a change if it believes that its prior interpretation was incorrect. Thus, we have no intention of discouraging agencies from reevaluating their positions regarding the meaning of statutes.

---

309(c)(1) is therefore inapplicable. *See* Br. of amicus at 17 (citing Brief for respondent in *Castro-Cortez v. INS* at 38-39, No. 99-70267 (9th Cir.) (filed Mar. 27, 2000) (referencing section 309(c)(1) and arguing that "[u]nless an alien is in deportation or exclusion proceedings when the INS attempts to reinstate the alien's prior order, section 241(a)(5) applies to the alien.") (copy attached to amicus brief as Exh. C)). Relatedly, in *St. Cyr* the INS argued that "Congress' comprehensive establishment of a new immigration framework . . . shows its intent that, after a transition period, the provisions of the old law should no longer be applied at all." *St. Cyr*, 533 U.S. at 317, 121 S.Ct. at 2288 (quoting Br. of INS at 33-34).

19. None of the judges of the en banc court in *Rosales-Garcia* accepted the government's argument. We also note that, as Sierra points out, the government's petition for a writ of certiorari in *Rosales-Garcia* did not ask that the Supreme Court review the court of appeal's holding that section 1231(a)(6) applies to Mariel Cubans who, like Sierra, were in immigration proceedings prior to IIRIRA's effective date. *See* Reply Br. of appellant at 2.

Nevertheless an agency's interpretation is entitled to deference in accordance with the " 'thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257, 111 S.Ct. 1227, 1235 (1991) (internal quotation marks and citations omitted). In view of the government's shifting position that we have set forth, we accord little deference to its contention here. First, the government appears to have advocated only in litigation the application of pre-IIRIRA law to petitioners whose cases are procedurally similar to Sierra's. *See Rosales-Garcia*, 322 F.3d at 403 n.22. "An interpretation contained in a brief—like interpretations contained in opinion letters, policy statements, agency manuals, and enforcement guidelines—lacks the force of law and therefore is not entitled to *Chevron* deference." *Id.*; *see also Chavez-Rivas v. Olsen*, 207 F. Supp. 2d 326, 332 (D.N.J. 2002). Second, as discussed above, the government's position has been inconsistent and is therefore unpersuasive.[20] *Rosales-Garcia*, 322 F.3d at 403 n.22 ("In a number of other cases in which excluded, deported, or removed aliens challenged the legality of their continued detention, the government argued that IIRIRA should apply to alien petitioners who had been excluded or deported prior to April 1, 1997.") (citations omitted); *see also Chavez-Rivas*, 207 F. Supp. 2d at 332 ("The INS's interpretation, I am sad to report, appears to be no more than an ad hoc judgment offered for no greater purpose or policy than that it is advantageous to advance the INS's position in this particular litigation.").[21]

---

20. As the court of appeals noted in *Rosales-Garcia*, "[i]nasmuch as shifting agency interpretations issued in *regulations* are accorded less deference under the highly deferential *Chevron* standard, we see no reason why we should respect shifting agency interpretations expressed in briefs." 322 F.3d at 403 n.22 (internal citations omitted).

21. Our quotation from *Chavez-Rivas* should not be taken as a signal that we are critical of the government with respect to its attempt to apply IIRIRA temporally as the statute surely is not clear. *See Chi Thon Ngo v. INS*, 192 F.3d 390, 395 n.5 (3d Cir. 1999).

In conclusion, because the best interpretation of section 309(c)(1) as adopted by several courts of appeals is that IIRIRA applies unless the petitioner was in deportation proceedings pending on April 1, 1997, we will interpret IIRIRA that way. In the circumstances, inasmuch as Sierra's proceedings were concluded in 1992 and therefore no longer were pending on April 1, 1997, section 1231(a)(6) governs his current detention and we will apply that statute here.

C. Construction of Section 1231(a)(6) as Applied to Sierra

In view of our conclusion that section 1231(a)(6) governs Sierra's detention,[22] we must determine whether the Supreme Court's holding in *Zadvydas*, reading into section 1231(a)(6) a temporal limit on post-removal detention for resident aliens, also applies to the detention of an unadmitted, inadmissible alien such as Sierra. The district court held that *Zadvydas* was not applicable because, unlike the petitioners in *Zadvydas*, Sierra "never effectuated an entry into the United States." JA 12. Sierra argues that the district court's "opinion reflects an incorrect reading of *Zadvydas*, which construed the statute which authorizes imprisonment of *all* immigrants pending deportation, whether or not they have affected a legal entry into the United States." Br. of appellant at 6. Sierra claims that the district court erred, "because it is well-established that a statutory interpretation rendered by the Supreme Court, even on the basis of the Constitutional avoidance doctrine, is binding in all applications of the statute." Br. of appellant at 10.

---

22. If we had concluded that the government is correct that pre-IIRIRA law governs the detention, we would have held that the Attorney General has the authority to detain Sierra indefinitely pending his deportation and thus we would have affirmed the denial of his petition for a writ of habeas corpus. *See Chi Thon Ngo v. INS*, 192 F.3d 390, 395 (3d Cir. 1999). While the ACLU argues to the contrary, *see* Br. of amicus at 24-27, the government is correct in its contention that the Supreme Court's decision in *Zadvydas* did not undermine *Ngo*'s holding in this respect, and Sierra does not argue otherwise. *See Rios v. INS*, 324 F.3d 296, 297 (5th Cir. 2003).

(a) Section 1231(a)(6)

After an alien, such as Sierra, is ordered removed from the United States, the Attorney General must attempt to secure his removal within 90 days. *See* 8 U.S.C. § 1231(a)(1) (the "removal period"). Moreover, "[u]nder no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible . . . ." 8 U.S.C. § 1231(a)(2). Congress, however, recognizes that securing an alien's actual removal within 90 days is not always possible. Consequently section 1231(a)(6) authorizes the Attorney General to detain aliens beyond the 90-day removal period, as it provides:

> An alien ordered removed who is inadmissible under section 1182 of this title, removable [for violations of nonimmigrant status or entry conditions, violations of criminal laws, or threats to national security] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

The INS has detained Sierra because his conduct shows that he is a risk to the community.

(b) *Zadvydas v. Davis*

In *Zadvydas* the Supreme Court considered whether the government's authority under section 1231(a)(6) to detain two legal permanent residents beyond the 90-day removal period allowed it to detain them indefinitely. There two legal permanent residents were ordered removed by reason of their criminal convictions. The government, however, could not remove them because no country would accept them.

In evaluating the legality of indefinite detention in *Zadvydas*, the Supreme Court considered whether indefinite detention of resident aliens, if authorized by section 1231(a)(6) as the government contended was the case, would present constitutional problems. In making its determination the Court predicated its decision on its recognition that the two resident alien petitioners in *Zadvydas* enjoyed certain constitutional privileges

associated with individuals who have gained entry into the United States. 533 U.S. at 692-93, 121 S.Ct. at 2500. The Court explained, however, that *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625 (1953), permits the indefinite detention of unadmitted aliens the government is unable to send elsewhere, but noted that *Mezei* "differs from the present cases [in *Zadvydas*] in a critical respect" in that the alien in *Mezei* was " 'treated,' for constitutional purposes, 'as if stopped at the border.' " *Zadvydas*, 533 U.S. at 693, 121 S.Ct. at 2500 (quoting *Mezei*, 345 U.S. at 213, 215, 73 S.Ct. at 630, 631). Thus, the Court in *Zadvydas* explained that the distinction between aliens who have gained entry and those stopped at the border "made all the difference" in its earlier decision that Mezei's indefinite detention did not violate the Constitution. *Id.* at 692-93, 121 S.Ct. at 2500.

In *Zadvydas* the Court further stressed that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Id.* at 693, 121 S.Ct. at 2500. The Court also emphasized that "[i]t is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Id.*, 121 S.Ct. at 2500. "But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.*, 121 S.Ct. at 2500.

After an extended discussion of the serious constitutional problems of permitting the indefinite detention of legal permanent residents as opposed to unadmitted aliens, the Court in *Zadvydas* saved section 1231(a)(6) from possible unconstitutionality in the context of a resident alien by limiting the post-removal-period detention to a length of time reasonably necessary to bring about the actual removal of the resident alien. *Id.* at 694-99, 121 S.Ct. 2501-03. The Court then recognized six months as a presumptively reasonable time of post-removal-period detention for resident aliens, though the time may be extended if there is a significant likelihood of removal in the

foreseeable future. Furthermore, a release may be made subject to conditions a violation of which may justify a return of the alien to custody. *Id.* at 699-702, 121 S.Ct. 2503-05.

### (c) Courts of Appeals split post-*Zadvydas*

There is a division of opinion among the courts of appeals as to whether *Zadvydas* limits only the government's authority to detain resident aliens or whether it applies to all categories of aliens. *Compare Borrero v. Aljets*, 325 F.3d 1003, 1007 (8th Cir. 2003) (concluding "that *Zadvydas*'s six-month presumption of reasonableness is inapplicable to inadmissible aliens"), *Benitez v. Wallis*, 337 F.3d at 1301 (concluding that "[T]he government has the authority under § 1231(a)(6) to detain inadmissible aliens indefinitely and *Zadvydas*'s six-month presumption of reasonableness is inapplicable to inadmissible aliens."), *Rios v. INS*, 324 F.3d 296, 297 (5th Cir. 2003) (concluding that *Zadvydas* "distinguished the status of deportable aliens from that of excludable aliens"), and *Hoyte-Mesa v. Ashcroft*, 272 F.3d 989, 991 (7th Cir. 2001), *cert. denied*, 537 U.S. 846, 123 S.Ct. 185 (2002) (concluding that an inadmissible alien's "continued detention does not violate due process"), *with Rosales-Garcia*, 322 F.3d at 410-15 (applying the reasonableness limitation that the Supreme Court read into section 1231(a)(6) in *Zadvydas* to inadmissible aliens), and *Xi v. INS*, 298 F.3d 832, 837-39 (9th Cir. 2002) (same); *see also Martinez Vazquez*, 2003 WL 22244774, at *3. But notwithstanding this conflict among the courts of appeals, the Supreme Court has denied certiorari in cases representing both viewpoints. *See Benitez*, 337 F.3d at 1295-96.

Inasmuch as the Supreme Court has not resolved the issue we are constrained to reach a conclusion on the question of whether in the light of *Zadvydas* the government may detain an unadmitted alien indefinitely under section 1231(a)(6) if it is unable to send the alien to any other country. In this process we first will discuss why Sierra remains an inadmissible alien and then examine whether the reasonableness component, as read into section 1231(a)(6) by the Supreme Court in *Zadvydas*,

applies to inadmissible aliens. *See Benitez*, 337 F.3d at 1296.

(d) Sierra is an unadmitted alien

Although Sierra has been present physically in the United States for more than 20 years, the government never formally has admitted him and inasmuch as he was excludable when he arrived he is, as we explained above, an inadmissible alien. *See supra* note 3 and accompanying text. We reiterate that when Sierra arrived in the United States as part of the Mariel boatlift he was stopped at the border and paroled into this country. He was paroled because Congress has recognized that it is often appropriate to permit arriving aliens, such as Sierra, to make a temporary, unofficial entry into the United States pending the resolution of their applications. *See Benitez,* 337 F.3d at 1296; *see also* 8 U.S.C. § 1182(d)(5)(A) (granting authority to Attorney General to parole an alien seeking admission into the United States, but providing that such parole does not constitute an admission of the alien). But the Supreme Court has rejected claims that the parole or detention of an unadmitted alien has any effect on the alien's status under the law. *See Leng May Ma v. Barber*, 357 U.S. 185, 78 S.Ct. 1072 (1958).[23] Because detention or parole does not alter an alien's legal status it is clear that Sierra is an inadmissible alien in a legal position similar to that of any other alien who has not gained entry and has been stopped at this country's border. *See Benitez*, 337 F.3d at 1296. Thus, legally, though Sierra is physically in the United States, he has not been admitted

---

23. In *Leng May Ma*, the Court noted that "[f]or over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States." 357 U.S. at 188, 78 S.Ct. at 1074. Likewise, the Court explained that "[t]he parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status . . . ." *Id.* at 190, 78 S.Ct. at 1075; *see also Mezei*, 345 U.S. at 215, 73 S.Ct. at 631 (alien permitted to enter pending decision on admissibility "is treated as if stopped at the border").

to this country. In short, he is both inadmissible and unadmitted.

Any discussion of Sierra's rights in the immigration context also must recognize the fundamental difference in the legal status of (1) unadmitted aliens such as Sierra and (2) resident aliens who have effected "entry" into the United States, whether illegally or legally. *See id. Zadvydas* recognized this critical distinction which has been a hallmark of immigration law for more than a hundred years. *Id.* For example, in *Leng May Ma* the Supreme Court emphasized that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality." 357 U.S. at 187, 78 S.Ct. at 1073. The Court continued that "[i]n the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.' " *Id.* (quoting *Mezei*, 345 U.S. at 212, 73 S.Ct. at 629).[24]

(e) *Zadvydas*'s temporal limitation on detention does not apply to Sierra

Although Sierra does not argue that he has a constitutional right precluding his continued detention, he does argue that he has a statutory right under section 1231(a)(6), post-*Zadvydas*, prohibiting indefinite detention.[25] *See* Br. of appellant at 17. We reiterate that there is a split of opinion among the courts of appeals regarding the breadth of *Zadvydas*'s holding. The Courts of Appeals for the Sixth and Ninth Circuits have held that *Zadvydas*

24. The Court further has explained that aliens seeking admission, such as Sierra, have no constitutional rights regarding their applications for admission. *See Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative . . . . [H]owever, once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.") (internal citations omitted).

25. The government does not contend that repatriation by Cuba of Sierra is reasonably foreseeable.

applies to all aliens regardless of their legal status. *See Rosales-Garcia*, 322 F.3d at 405-06; *Xi*, 298 F.3d at 835-36. However, the Courts of Appeals for the Fifth, Seventh, Eighth, and Eleventh Circuits have concluded that *Zadvydas* does not affect the government's long-standing authority to detain indefinitely unadmitted aliens. *See Benitez,* 337 F.3d at 1298-1301.[26]

The Courts of Appeals for the Eighth and Eleventh Circuits have addressed in some detail the issue of whether the *Zadvydas* Court's construction of section 1231(a)(6) as containing a "reasonableness" component must apply categorically to all aliens, regardless of the aliens' legal status. *Borrero*, 325 F.3d at 1005-07; *Benitez*, 337 F.3d at 1298-1301. Both courts applied *Zadvydas* as limiting the detention period of only those aliens whose continued confinement raises serious constitutional doubt and both courts expressly rejected the argument that the same statutory construction of section 1231(a)(6) must apply categorically to all future cases whether or not their circumstances raise the same constitutional questions. These courts thoroughly have set forth reasons which convince us to reject Sierra's argument about how section 1231(a)(6) must be read post-*Zadvydas*.

First, in *Borrero* the court explained that *Zadvydas* limited "the detention only of those aliens whose detention raises serious constitutional doubt — admitted aliens." *Borrero*, 325 F.3d at 1007. Second, it emphasized that "*Zadvydas* itself does not mandate uniform application of § 1231(a)(6) to all aliens." *Id.* The court reached this conclusion based, in part, on the Supreme Court's notation that " 'terrorism or other special circumstances' may justify greater deference to Congress and the Executive." *Id.* (quoting *Zadvydas*, 533 U.S. at 696, 121 S.Ct. at 2502). Third, the court of appeals stressed how *Zadvydas* "expressly distinguished *Mezei* on the grounds that *Mezei*

---

26. Various district courts have come to the same conclusion. *See*, *e.g.*, *Gonzalez v. Ashcroft*, No. 03-2290 (JLL), ___ F. Supp. 2d ___, 2003 WL 22012599 (D.N.J. Aug. 26, 2003); *Napoles v. INS*, No. 3:02CV2116 (PCD), ___ F. Supp. 2d ___, 2003 WL 21999003 (D. Conn. July 22, 2003).

had not made an entry into the United States." *Borrero*, 325 F.3d at 1007. Based on these reasons, the court concluded that "*Zadvydas*'s six-month presumption of reasonableness is inapplicable to inadmissible aliens." *Id.*

In *Benitez* the court of appeals stated that it found the *Borrero* court's reasoning persuasive and therefore adopted it. *See Benitez*, 337 F.3d at 1299. In addition, the *Benitez* court set forth several other reasons for reaching its conclusion. First, according to *Benitez* "*Zadvydas* reads like an as-applied constitutional challenge where the Supreme Court repeatedly stated that its holding would not necessarily apply to other situations." *Id.* Because *Zadvydas* was qualified in so many respects and reads like an as-applied decision, the court of appeals concluded that the Supreme Court left the law and the statutory scheme intact with respect to inadmissible aliens who never have been admitted into the United States. *Id.*

Second, the court of appeals in *Benitez*, adopting the reasoning of the dissent in *Xi*, stated that it takes "the Supreme Court at its word: while indefinite detention raises serious constitutional questions in the case of aliens who have been admitted to the United States, '[a]liens who have not yet gained initial admission to this country would present a very different question.'" *Id.* (quoting *Xi*, 298 F.3d at 840 (Rymer, J., dissenting) (quoting *Zadvydas*, 533 U.S. at 682, 121 S.Ct. at 2495)). In *Zadvydas* the Supreme Court expressly declined to overrule *Mezei*.[27] *Zadvydas*, 533

---

27. Notwithstanding *Zadvydas*, *Mezei* plainly remains good law. *See Hoyte-Mesa*, 272 F.3d at 991. As the dissent in *Rosales-Garcia* reminded, the

Supreme Court has recently and emphatically instructed us that we should leave the overruling of Supreme Court precedents to that Court, even if we believe, or divine, that the Court should, or will, overrule them. *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 2017 (1997). No matter how much the court may disagree with the distinction between excludable and deportable aliens, it simply cannot be disputed that the controlling Supreme Court precedent makes that distinction and holds that excludable aliens do not have a constitutional right to be permitted to remain in the United States at liberty if their removal cannot be seasonably obtained.

322 F.3d at 418 (Boggs, J., dissenting).

U.S. at 693, 121 S.Ct. at 2500. The court of appeals in *Benitez* also rejected the argument that *Zadvydas* leaves courts with little choice but to apply section 1231(a)(6) uniformly to all aliens.[28] 337 F.3d at 1299. Quoting Judge

---

28. Sierra relies on three cases to support his position that once the Supreme Court interpreted section 1231(a)(6), that interpretation applies to all immigrants: *Rosales-Garcia* and *Xi*, both of which held that *Zadvydas*'s holding applies to excludable/inadmissible aliens, and *Chmakov v. Blackman*, 266 F.3d 210, 214-15 (3d Cir. 2001), in which we confronted the question of whether the Supreme Court's determination in *St. Cyr* that IIRIRA did not revoke federal habeas jurisdiction for aliens with no other avenue of review applied equally to aliens who had other review available. We do not find these cases to be persuasive in the context here. To start with we are satisfied that the reasoning in *Rosales-Garcia* and *Xi* is not as persuasive as that in *Benitez* and *Borrero*. With respect to *Chmakov*, Sierra suggests that in that case "this Court held that statutory interpretations based on the doctrine of Constitutional avoidance, like *Zadvydas*, apply in all applications of the statute." *See* Reply Br. of appellant at 5. The court in *Chavez-Rivas* explained why *Chmakov* does not stand for this proposition. "It appears . . . that *Chmakov* was based, not on the view of the avoidance canon that [petitioner] argues, but rather on the common-law notion that statutes repealing jurisdiction are not favored." 207 F. Supp. 2d at 334. As the court in *Chavez-Rivas* further explained,

> [n]or does some of the broad-sweeping language of *Chmakov* point to a contrary conclusion . . . . This language . . . is part of the court's analysis of whether or not IIRIRA 'clearly' withdraws habeas jurisdiction. The INS had claimed that the very language in IIRIRA that the Supreme Court found insufficiently clear in *St. Cyr* could nonetheless be clear enough to withdraw habeas jurisdiction for Chmakov. The *Chmakov* court, in rejecting that argument, simply concluded that what the Supreme Court had already found unclear could not magically become clear. The reference to the 'background or pedigree of the petitioner' likely is meant only to emphasize the fact that the standard for statutory clarity is the same regardless of whether the clear statement rule is supplied by the avoidance canon or by common law principles.

*Id.* at 334-35 (internal citation omitted).

The ACLU cites two cases in an attempt to support its argument that a Supreme Court interpretation based on the avoidance canon necessarily binds all subsequent interpretations of the statute, *Food Chemical News v. Young*, 900 F.2d 328, 332-33 (D.C. Cir. 1990), and *Sofamor Danek Group, Inc. v. Gaus*, 61 F.3d 929, 936 n.36 (D.C. Cir.

Rymer's dissent in *Xi, Benitez* stated that, "[w]e do have a choice because the Court's interpretation was discrete as to *admitted* aliens" and "[i]t was driven by the need to avoid constitutional problems that pertain to those who are admitted—but that do not pertain to those who are *not* admitted." *Id.* (citation omitted). The court further agreed with Judge Rymer that "[t]he result is a nuanced interpretation of § 1231(a)(6) that keeps it from being applied unconstitutionally but otherwise leaves it alone. When a statute has different applications, it is not necessary to say that it is categorically infirm; it is only the constitutionally problematic aspects which are subject to the construction that avoids the problem." *Id.* (citation omitted).

Third, as the *Benitez* court explained, the ability to exclude aliens from this country at its borders is a duty entrusted to the Executive Branch so that it may protect the citizens and residents of this country from all manner of nameless dangers. *See id.* at 1300. In *Zadvydas*, the Supreme Court emphasized that the cases before it did not require it to consider the political branches' authority to control entry into the United States and therefore the court was not leaving an "unprotected spot in the Nation's armor." *Zadvydas*, 533 U.S. at 695-96, 121 S.Ct. at 2502 (citation omitted). "Creating a right to parole for unadmitted aliens after six months would create an unprotected spot in this country's defense of its borders." *Benitez*, 337 F.3d at 1300. For example, the government may not be able to determine what potential dangers a particular unadmitted

1995). However, as the court in *Chavez Rivas* explained, these cases do not support the ACLU's argument. "*Food Chemical News* . . . never even mentions the avoidance canon. Instead, it seems to conclude that the Supreme Court would have reached the same result based on ordinary principles of statutory interpretation, such that the existence or not of a constitutional issue in later cases would not matter . . . . Thus, when the D.C. Circuit subsequently relied on *Food Chemical News* to apply the Supreme Court's narrow definition [in *Sofamor Danek*], it had no occasion to decide whether the Supreme Court's avoidance rationale required that interpretation." 207 F. Supp. 2d at 335 (internal citations omitted).

alien might pose. See *id.* "In such a situation, the government historically has enjoyed broad latitude in detaining those aliens until their security threat can be fully ascertained. Removing this important tool from the government's arsenal undoubtedly would subject the residents of this nation to greater security risks." *Id.*

Fourth, the court of appeals in *Benitez* reiterated that "Congress has given the Attorney General the discretion to detain or parole persons who are not admitted into this country and whose own country will not take them back." *Id.* In light of the fact that the Supreme Court in *Zadvydas* went to such great lengths to distinguish inadmissible aliens from aliens who have gained entry, courts should not fetter that discretion by presumptively requiring their release into this country after six months. *Id.*

Fifth and finally, in *Benitez* the court of appeals stated that "reading § 1231(a)(6) as creating a right to parole into this country after six months for inadmissible aliens is undoubtedly a drastic expansion of the rights of inadmissible aliens, who have never gained entry into this country." *Id.* Moreover, as the *Benitez* court indicated, "[i]t is without question that Congress had a contrary intention when enacting IIRIRA: it sought to tighten immigration regulations. As the very language of IIRIRA mandates, courts are not to construe IIRIRA to 'create any substantive or procedural right or benefit that is legally enforceable.' 8 U.S.C. § 1231(h)." *Benitez,* 337 F.3d at 1300. The court went on to indicate that "[i]t is also clear that Congress intended the use of the term 'inadmissibility' to subject removable aliens to the same potential for indefinite detention—if they could not be removed after the commission of a serious crime—to which excludable aliens had been subject both statutorily and constitutionally for years." *Id.*

The *Benitez* court further explained that inadmissible aliens who never have been admitted into the United States never truly have resided in this country free from restraint. *See id.* at 1301. "Rather, Congress has bestowed on them the luxury of parole while their immigration applications and status are finalized. To pervert this gift from Congress into a right after six months not only would distort

Congress's intent and potentially create grave security concerns for the people of the United States, but also would create needless difficulties in how the INS processes aliens." *Id.*

We have considered the precedents on both sides of the *Zadvydas* issue and have made an independent analysis of the parties' arguments with respect to the case's application. From these examinations we have concluded that inasmuch as *Zadvydas*'s holding is qualified in so many regards, and there is no need to construe section 1231(a)(6) to avoid constitutional due process concerns for inadmissible aliens who never have been admitted into the United States, the Attorney General has the authority under section 1231(a)(6) to detain Sierra indefinitely and *Zadvydas*'s six-month presumption of reasonableness is not applicable to him. Accordingly, the district court properly denied his petition for a writ of habeas corpus.

## III. CONCLUSION

In summary, we agree with the courts of appeals that have held section 1231(a)(6) is applicable in cases in procedural postures similar to this case but we hold that Sierra is not entitled to relief under that section as it permits his indefinite detention. Accordingly, we will affirm the orders of May 17, 2002, and June 18, 2002, denying his petition for a writ of habeas corpus.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*